UNITED STATES DEPARTMENT OF AGRICUL-
TURE ET AL. *v.* MORENO ET AL.

No. 72–534. Argued April 23, 1973—Decided June 25, 1973

BRENNAN, J., delivered the opinion of the Court, in which DOUG-
LAS, STEWART, WHITE, MARSHALL, BLACKMUN, and POWELL, JJ.,
joined. DOUGLAS, J., filed a concurring opinion, *post*, p. 538. REHN-
QUIST, J., filed a dissenting opinion, in which BURGER, C. J., joined,
*post*, p. 545.

*A. Raymond Randolph, Jr.,* argued the cause for ap-
pellants. With him on the briefs were *Solicitor General*

*Griswold, Assistant Attorney General Wood, Walter H. Fleischer,* and *William Kanter.*

*Ronald F. Pollack* argued the cause for appellees. With him on the brief was *Roger A. Schwartz.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

This case requires us to consider the constitutionality of § 3 (e) of the Food Stamp Act of 1964, 7 U. S. C. § 2012 (e), as amended in 1971, 84 Stat. 2048, which, with certain exceptions, excludes from participation in the food stamp program any household containing an individual who is unrelated to any other member of the household. In practical effect, § 3 (e) creates two classes of persons for food stamp purposes: one class is composed of those individuals who live in households all of whose members are related to one another, and the other class consists of those individuals who live in households containing one or more members who are unrelated to the rest. The latter class of persons is denied federal food assistance. A three-judge District Court for the District of Columbia held this classification invalid as violative of the Due Process Clause of the Fifth Amendment. 345 F. Supp. 310 (1972). We noted probable jurisdiction. 409 U. S. 1036 (1972). We affirm.

I

The federal food stamp program was established in 1964 in an effort to alleviate hunger and malnutrition among the more needy segments of our society. 7 U. S. C. § 2011. Eligibility for participation in the program is determined on a household rather than an individual basis. 7 CFR § 271.3 (a). An eligible household purchases sufficient food stamps to provide that household with a nutritionally adequate diet. The household pays for the stamps at a reduced rate based

upon its size and cumulative income. The food stamps are then used to purchase food at retail stores, and the Government redeems the stamps at face value, thereby paying the difference between the actual cost of the food and the amount paid by the household for the stamps. See 7 U. S. C. §§ 2013 (a), 2016, 2025 (a).

As initially enacted, § 3 (e) defined a "household" as "a group of *related or non-related* individuals, who are not residents of an institution or boarding house, but are living as one economic unit sharing common cooking facilities and for whom food is customarily purchased in common." [1] In January 1971, however, Congress redefined the term "household" so as to include only groups of *related* individuals. [2] Pursuant to this amendment, the Secretary of Agriculture promulgated regulations rendering ineligible for participation in the program any "household" whose members are not "all related to each other." [3]

---

[1] 78 Stat. 703 (emphasis added). The act provided further that "[t]he term 'household' shall also mean a single individual living alone who has cooking facilities and who purchases and prepares food for home consumption." *Ibid.*

[2] 84 Stat. 2048. The 1971 amendment did not affect certain groups of nonrelated individuals over 60 years of age. As amended, § 3 (e) now provides:

"The term 'household' shall mean a group of related individuals (including legally adopted children and legally assigned foster children) or non-related individuals over age 60 who are not residents of an institution or boarding house, but are living as one economic unit sharing common cooking facilities and for whom food is customarily purchased in common. The term 'household' shall also mean (1) a single individual living alone who has cooking facilities and who purchases and prepares food for home consumption, or (2) an elderly person who meets the requirements of section 2019 (h) of this title." 7 U. S. C. § 2012 (e).

[3] Title 7 CFR § 270.2 (jj) provides:

"(jj) 'Household' means a group of persons, excluding roomers, boarders, and unrelated live-in attendants necessary for medical,

Appellees in this case consist of several groups of individuals who allege that, although they satisfy the income eligibility requirements for federal food assistance, they have nevertheless been excluded from the program solely because the persons in each group are not "all related to each other." Appellee Jacinta Moreno, for example, is a 56-year-old diabetic who lives with Ermina Sanchez and the latter's three children. They share common living expenses, and Mrs. Sanchez helps to care for appellee. Appellee's monthly income, derived from public assistance, is $75; Mrs. Sanchez receives $133 per month from public assistance. The household pays $135 per month for rent, gas, and electricity, of which appellee pays $50. Appellee spends $10 per month for transportation to a hospital for regular visits, and $5 per month for laundry. That leaves her $10 per month for food and other necessities. Despite her poverty, appellee has been denied federal food assistance solely because she is unrelated to the other members of her household. Moreover, although Mrs. Sanchez and her three children were permitted to purchase $108 worth of food stamps per month for $18, their participation in the program will be

housekeeping, or child care reasons, who are not residents of an institution or boarding house, and who are living as one economic unit sharing common cooking facilities and for whom food is customarily purchased in common: *Provided,* That:

"(1) When all persons in the group are under 60 years of age, they are all related to each other; and

"(2) When more than one of the persons in the group is under 60 years of age, and one or more other persons in the group is 60 years of age or older, each of the persons under 60 years of age is related to each other or to at least one of the persons who is 60 years of age or older.

"It shall also mean (i) a single individual living alone who purchases and prepares food for home consumption, or (ii) an elderly person as defined in this section, and his spouse."

terminated if appellee Moreno continues to live with them.

Appellee Sheilah Hejny is married and has three children. Although the Hejnys are indigent, they took in a 20-year-old girl, who is unrelated to them, because "we felt she had emotional problems." The Hejnys receive $144 worth of food stamps each month for $14. If they allow the 20-year-old girl to continue to live with them, they will be denied food stamps by reason of § 3 (e).

Appellee Victoria Keppler has a daughter with an acute hearing deficiency. The daughter requires special instruction in a school for the deaf. The school is located in an area in which appellee could not ordinarily afford to live. Thus, in order to make the most of her limited resources, appellee agreed to share an apartment near the school with a woman who, like appellee, is on public assistance. Since appellee is not related to the woman, appellee's food stamps have been, and will continue to be, cut off if they continue to live together.

These and two other groups of appellees instituted a class action against the Department of Agriculture, its Secretary, and two other departmental officials, seeking declaratory and injunctive relief against the enforcement of the 1971 amendment of § 3 (e) and its implementing regulations. In essence, appellees contend,[4] and the District Court held, that the "unrelated person" provision of § 3 (e) creates an irrational classification in violation

---

[4] Appellees also argued that the regulations themselves were invalid because beyond the scope of the authority conferred upon the Secretary by the statute. The District Court rejected that contention, and appellees have not pressed that argument on appeal. Moreover, appellees did not challenge the constitutionality of the statute's reliance on "households" rather than "individuals" as the basic unit of the food stamp program. We therefore intimate no view on that question.

of the equal protection component of the Due Process Clause of the Fifth Amendment.[5]  We agree.

## II

Under traditional equal protection analysis, a legislative classification must be sustained if the classification itself is rationally related to a legitimate governmental interest.  See *Jefferson* v. *Hackney,* 406 U. S. 535, 546 (1972); *Richardson* v. *Belcher,* 404 U. S. 78, 81 (1971); *Dandridge* v. *Williams,* 397 U. S. 471, 485 (1970); *McGowan* v. *Maryland,* 366 U. S. 420, 426 (1961).  The purposes of the Food Stamp Act were expressly set forth in the congressional "declaration of policy":

> "It is hereby declared to be the policy of Congress . . . to safeguard the health and well-being of the Nation's population and raise levels of nutrition among low-income households.  The Congress hereby finds that the limited food purchasing power of low-income households contributes to hunger and malnutrition among members of such households. The Congress further finds that increased utilization of food in establishing and maintaining adequate national levels of nutrition will promote the distribution in a beneficial manner of our agricultural abundances and will strengthen our agricultural economy, as well as result in more orderly marketing and distribution of food.  To alleviate such hunger and malnutrition, a food stamp program is herein authorized which will permit low-income households to

---

[5] "[W]hile the Fifth Amendment contains no equal protection clause, it does forbid discrimination that is 'so unjustifiable as to be violative of due process.'" *Schneider* v. *Rusk,* 377 U. S. 163, 168 (1964); see *Frontiero* v. *Richardson,* 411 U. S. 677, 680 n. 5 (1973); *Shapiro* v. *Thompson,* 394 U. S. 618, 641–642 (1969); *Bolling* v. *Sharpe,* 347 U. S. 497 (1954).

purchase a nutritionally adequate diet through normal channels of trade." 7 U. S. C. § 2011.

The challenged statutory classification (households of related persons versus households containing one or more unrelated persons) is clearly irrelevant to the stated purposes of the Act. As the District Court recognized, "[t]he relationships among persons constituting one economic unit and sharing cooking facilities have nothing to do with their abilities to stimulate the agricultural economy by purchasing farm surpluses, or with their personal nutritional requirements." 345 F. Supp., at 313.

Thus, if it is to be sustained, the challenged classification must rationally further some legitimate governmental interest other than those specifically stated in the congressional "declaration of policy." Regrettably, there is little legislative history to illuminate the purposes of the 1971 amendment of § 3 (e).[6] The legislative history that does exist, however, indicates that that amendment was intended to prevent so-called "hippies" and "hippie communes" from participating in the food stamp program. See H. R. Conf. Rep. No. 91–1793, p. 8; 116 Cong. Rec. 44439 (1970) (Sen. Holland). The challenged classification clearly cannot be sustained by reference to this congressional purpose. For if the constitutional conception of "equal protection of the laws" means anything, it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest. As a result, "[a] purpose to discriminate against hippies cannot, in and of itself and without reference to [some independent] considerations in the

---

[6] Indeed, the amendment first materialized, bare of committee consideration, during a conference committee's consideration of differing House and Senate bills.

public interest, justify the 1971 amendment." 345 F. Supp., at 314 n. 11.

Although apparently conceding this point, the Government maintains that the challenged classification should nevertheless be upheld as rationally related to the clearly legitimate governmental interest in minimizing fraud in the administration of the food stamp program.[7] In essence, the Government contends that, in adopting the 1971 amendment, Congress might rationally have thought (1) that households with one or more unrelated members are more likely than "fully related" households to contain individuals who abuse the program by fraudulently failing to report sources of income or by voluntarily remaining poor; and (2) that such households are "relatively unstable," thereby increasing the difficulty of detecting such abuses. But even if we were to accept as rational the Government's wholly unsubstantiated assumptions concerning the differences between "related" and "unrelated" households, we still could not agree with the Government's conclusion that the denial of essential

---

[7] The Government initially argued to the District Court that the challenged classification might be justified as a means to foster "morality." In rejecting that contention, the District Court noted that "interpreting the amendment as an attempt to regulate morality would raise serious constitutional questions." 345 F. Supp. 310, 314. Indeed, citing this Court's decisions in *Griswold* v. *Connecticut*, 381 U. S. 479 (1965), *Stanley* v. *Georgia*, 394 U. S. 557 (1969), and *Eisenstadt* v. *Baird*, 405 U. S. 438 (1972), the District Court observed that it was doubtful, at best, whether Congress, "in the name of morality," could "infringe the rights to privacy and freedom of association *in the home.*" 345 F. Supp., at 314. (Emphasis in original.) Moreover, the court also pointed out that the classification established in § 3 (e) was not rationally related "to prevailing notions of morality, since it in terms disqualifies all households of unrelated individuals, without reference to whether a particular group contains both sexes." *Id.*, at 315. The Government itself has now abandoned the "morality" argument. See Brief for Appellants 9.

federal food assistance to *all* otherwise eligible households containing unrelated members constitutes a rational effort to deal with these concerns.

At the outset, it is important to note that the Food Stamp Act itself contains provisions, wholly independent of § 3 (e), aimed specifically at the problems of fraud and of the voluntarily poor. For example, with certain exceptions, § 5 (c) of the Act, 7 U. S. C. § 2014 (c), renders ineligible for assistance any household containing "an able-bodied adult person between the ages of eighteen and sixty-five" who fails to register for, and accept, offered employment. Similarly, §§ 14 (b) and (c), 7 U. S. C. §§ 2023 (b) and (c), specifically impose strict criminal penalties upon any individual who obtains or uses food stamps fraudulently.[8] The existence of these pro-

---

[8] Title 7 U. S. C. §§ 2023 (b) and (c) provide:

"(b) Whoever knowingly uses, transfers, acquires, alters, or possesses coupons or authorization to purchase cards in any manner not authorized by this [Act] or the regulations issued pursuant to this [Act] shall, if such coupons or authorization to purchase cards are of the value of $100 or more, be guilty of a felony and shall, upon conviction thereof, be fined not more than $10,000 or imprisoned for not more than five years or both, or, if such coupons or authorization to purchase cards are of a value of less than $100, shall be guilty of a misdemeanor and shall, upon conviction thereof, be fined not more than $5,000 or imprisoned for not more than one year, or both.

"(c) Whoever presents, or causes to be presented, coupons for payment or redemption of the value of $100 or more, knowing the same to have been received, transferred, or used in any manner in violation of the provisions of this [Act] or the regulations issued pursuant to this [Act] shall be guilty of a felony and shall, upon conviction thereof, be fined not more than $10,000 or imprisoned for not more than five years, or both, or, if such coupons are of a value of less than $100, shall be guilty of a misdemeanor and shall, upon conviction thereof, be fined not more than $5,000 or imprisoned for not more than one year, or both."

visions necessarily casts considerable doubt upon the proposition that the 1971 amendment could rationally have been intended to prevent those very same abuses. See *Eisenstadt* v. *Baird,* 405 U. S. 438, 452 (1972); cf. *Dunn* v. *Blumstein,* 405 U. S. 330, 353–354 (1972).

Moreover, in practical effect, the challenged classification simply does not operate so as rationally to further the prevention of fraud. As previously noted, § 3 (e) defines an eligible "household" as "a group of related individuals . . . [1] living as one economic unit [2] sharing common cooking facilities [and 3] for whom food is customarily purchased in common." Thus, two *unrelated* persons living together and meeting all three of these conditions would constitute a single household ineligible for assistance. If financially feasible, however, these same two individuals can legally avoid the "unrelated person" exclusion simply by altering their living arrangements so as to eliminate any one of the three conditions. By so doing, they effectively create two separate "households," both of which are eligible for assistance. See *Knowles* v. *Butz,* 358 F. Supp. 228 (ND Cal. 1973). Indeed, as the California Director of Social Welfare has explained: [9]

> "The 'related household' limitations will eliminate many households from eligibility in the Food Stamp Program. It is my understanding that the Congressional intent of the new regulations are specifically aimed at the 'hippies' and 'hippie communes.' Most people in this category can and will alter their living arrangements in order to remain eligible for food stamps. However, the AFDC mothers who try to raise their standard of living by sharing housing will be affected. They will not be able to

---

[9] App. 43.

utilize the altered living patterns in order to continue to be eligible without giving up their advantage of shared housing costs."

Thus, in practical operation, the 1971 amendment excludes from participation in the food stamp program, *not* those persons who are "likely to abuse the program" but, rather, *only* those persons who are so desperately in need of aid that they cannot even afford to alter their living arrangements so as to retain their eligibility. Traditional equal protection analysis does not require that every classification be drawn with precise " 'mathematical nicety.' " *Dandridge* v. *Williams,* 397 U. S., at 485. But the classification here in issue is not only "imprecise," it is wholly without any rational basis. The judgment of the District Court holding the "unrelated person" provision invalid under the Due Process Clause of the Fifth Amendment is therefore

*Affirmed*

MR. JUSTICE DOUGLAS, concurring.

Appellee Jacinta Moreno is a 56-year-old diabetic who lives with Ermina Sanchez and the latter's three children. The two share common living expenses, Mrs. Sanchez helping to care for this appellee. Appellee's monthly income is $75, derived from public assistance, and Mrs. Sanchez' is $133, also derived from public assistance. This household pays $95 a month for rent, of which appellee pays $40, and $40 a month for gas and electricity, of which appellee pays $10. Appellee spends $10 a month for transportation to a hospital for regular visits and $5 a month for laundry. That leaves her $10 a month for food and other necessities. Mrs. Sanchez and the three children received $108 worth of food stamps per month for $18. But under the "unrelated" person

provision of the Act,[1] she will be cut off if appellee Moreno continues to live with her.

Appellee Sheilah Hejny is married and has three children, ages two to five. She and her husband took in a 20-year-old girl who is unrelated to them. She shares in the housekeeping. The Hejnys pay $14 a month and receive $144 worth of food stamps. The Hejnys comprise an indigent household. But if they allow the 20-year-old girl to live with them, they too will be cut off from food stamps by reason of the "unrelated" person provision.

---

[1] Section 3 (e) of the Food Stamp Act provides in relevant part:

"The term 'household' shall mean a group of related individuals (including legally adopted children and legally assigned foster chilren) or non-related individuals over age 60 who are not residents of an institution or boarding house, but are living as one economic unit sharing common cooking facilities and for whom food is customarily purchased in common."  7 U. S. C. § 2012 (e).

The Regulations provide: " 'Household' means a group of persons, excluding roomers, boarders, and unrelated live-in attendants necessary for medical, housekeeping, or child care reasons, who are not residents of an institution or boarding house, and who are living as one economic unit sharing common cooking facilities and for whom food is customarily purchased in common: *Provided,* That:

"(1) When all persons in the group are under 60 years of age, they are all related to each other; and

"(2) When more than one of the persons in the group is under 60 years of age, and one or more other persons in the group is 60 years of age or older, each of the persons under 60 years of age is related to each other or to at least one of the persons who is 60 years of age or older." 7 CFR § 270.2 (jj).

"Eligibility for and participation in the program shall be on a household basis. All persons, excluding roomers, boarders, and unrelated live-in attendants necessary for medical, housekeeping, or child care reasons, residing in common living quarters shall be consolidated into a group prior to determining if such a group is a household as determined in § 270.2 (jj) of this subchapter." 7 CFR § 271.3 (a).

Appellee Keppler has a daughter with an acute hearing deficiency who requires instruction in a school for the deaf. The school is in an area where the mother cannot afford to live. So she and her two minor children moved into a nearby apartment with a woman who, like appellee· Keppler, is on public assistance but who is not related to her. As a result appellee Keppler's food stamps have been cut off because of the "unrelated" person provision.

These appellees instituted a class action to enjoin the enforcement of the "unrelated" person provision of the Act.

The "unrelated" person provision of the Act creates two classes of persons for food stamp purposes: one class is composed of people who are all related to each other and all in dire need; and the other class is composed of households that have one or more persons unrelated to the others but have the same degree of need as those in the first class. The first type of household qualifies for relief, the second cannot qualify, no matter the need. It is that application of the Act which is said to violate the conception of equal protection that is implicit in the Due Process Clause of the Fifth Amendment. *Bolling* v. *Sharpe,* 347 U. S. 497, 499.

The test of equal protection is whether the legislative line that is drawn bears "some rational relationship to a legitimate" governmental purpose.[2] *Weber* v. *Aetna*

---

[2] The purpose of the present Act was stated by Congress:

"[T]o safeguard the health and well-being of the *Nation's* population and *raise levels of nutrition* among low-income households. The Congress hereby finds that the limited food purchasing power of low-income households contributes *to hunger and malnutrition* among members of such households. The Congress further finds that increased utilization of food in establishing and maintaining *adequate national levels of nutrition* will promote the distribution in a beneficial manner of our agricultural abundances and will strengthen our

*Casualty & Surety Co.*, 406 U. S. 164, 172. The requirement of equal protection denies government "the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective" of the enactment. *Reed* v. *Reed*, 404 U. S. 71, 75–76.

This case involves desperately poor people with acute problems who, though unrelated, come together for mutual help and assistance. The choice of one's associates for social, political, race, or religious purposes is basic in our constitutional scheme. *NAACP* v. *Alabama*, 357 U. S. 449, 460; *De Jonge* v. *Oregon*, 299 U. S. 353, 363; *NAACP* v. *Button*, 371 U. S. 415, 429–431; *Gibson* v. *Florida Legislative Committee*, 372 U. S. 539; *NAACP* v. *Alabama*, 377 U. S. 288. It extends to "the associational rights of the members" of a trade union. *Brotherhood of Railroad Trainmen v. Virginia Bar*, 377 U. S. 1, 8.

I suppose no one would doubt that an association of people working in the poverty field would be entitled to the same constitutional protection as those working in the racial, banking, or agricultural field. I suppose poor people holding a meeting or convention would be under the same constitutional umbrella as others. The dimensions of the "unrelated" person problem under the Food Stamp Act are in that category. As the facts of this case show, the poor are congregating in households where they can better meet the adversities of poverty. This banding together is an expression of the right of freedom of association that is very deep in our traditions.

---

agricultural economy, as well as result in more orderly marketing and distribution of food. To alleviate such hunger and malnutrition, a food stamp program is herein authorized which will permit *low-income households to purchase a nutritionally adequate diet* through normal channels of trade." 7 U. S. C. § 2011. (Italics added.)

Other like rights have been recognized that are only peripheral First Amendment rights—the right to send one's child to a religious school, the right to study the German language in a private school, the protection of the entire spectrum of learning, teaching, and communicating ideas, the marital right of privacy. *Griswold* v. *Connecticut*, 381 U. S. 479, 482–483.

As the examples indicate, these peripheral constitutional rights are exercised not necessarily in assemblies that congregate in halls or auditoriums but in discrete individual actions such as parents placing a child in the school of their choice. Taking a person into one's home because he is poor or needs help or brings happiness to the household is of the same dignity.

Congress might choose to deal only with members of a family of one or two or three generations, treating it all as a unit. Congress, however, has not done that here. Concededly an individual living alone is not disqualified from the receipt of food stamp aid, even though there are other members of the family with whom he might theoretically live. Nor are common-law couples disqualified: they, like individuals living alone, may qualify under the Act if they are poor—whether they have abandoned their wives and children and however antifamily their attitudes may be. In other words, the "unrelated" person provision was not aimed at the maintenance of normal family ties. It penalizes persons or families who have brought under their roof an "unrelated" needy person. It penalizes the poorest of the poor for doubling up against the adversities of poverty.

But for the constitutional aspects of the problem, the "unrelated" person provision of the Act might well be sustained as a means to prevent fraud. Fraud is a concern of the Act. 7 U. S. C. §§ 2023 (b) and (c). Able-bodied persons must register and accept work or lose their food stamp rights. 7 U. S. C. § 2014 (c). I

could not say that this "unrelated" person provision has no "rational" relation to control of fraud. We deal here, however, with the right of association, protected by the First Amendment. People who are desperately poor but unrelated come together and join hands with the aim better to combat the crises of poverty. The need of those living together better to meet those crises is denied, while the need of households made up of relatives that is no more acute is serviced. Problems of the fisc, as we stated in *Shapiro* v. *Thompson,* 394 U. S. 618, 633, are legitimate concerns of government. But government "may not accomplish such a purpose by invidious distinctions between classes of its citizens." *Ibid.*

The legislative history of the Act indicates that the "unrelated" person provision of the Act was to prevent "essentially unrelated individuals who voluntarily chose to cohabit and live off food stamps" [3]—so-called "hippies" or "hippy communes"—from participating in the food stamp program. As stated in the Conference Report,[4] the definition of household was "designed to prohibit food stamp assistance to communal 'families' of unrelated individuals."

The right of association, the right to invite the stranger into one's home is too basic in our constitutional regime to deal with roughshod. If there are abuses inherent in that pattern of living against which the food stamp program should be protected, the Act must be "narrowly drawn," *Cantwell* v. *Connecticut,* 310 U. S. 296, 307, to meet the precise end. The method adopted and applied to these cases makes § 3 (e) of the Act unconstitutional by reason of the invidious discrimination between the two classes of needy persons.

---

[3] See 116 Cong. Rec. 42003.

[4] H. R. Conf. Rep. No. 91–1793, p. 8.

*Dandridge* v. *Williams,* 397 U. S. 471, is not opposed. It sustained a Maryland grant of welfare, against the claim of violation of equal protection, which placed an upper limit on the monthly amount any single family could receive. The claimants had large families so that their standard of need exceeded the actual grants. Their claim was that the grants of aid considered in light of the size of their families created an invidious discrimination against them and in favor of small needy families. The claim was rejected on the basis that state economic or social legislation had long been judged by a less strict standard than comes into play when constitutionally protected rights are involved. *Id.,* at 484–485. Laws touching social and economic matters can pass muster under the Equal Protection Clause though they are imperfect, the test being whether the classification has some "reasonable basis." *Ibid. Dandridge* held that "the Fourteenth Amendment gives the federal courts no power to impose upon the States their views of what constitutes wise economic or social policy." *Id.,* at 486. But for the First Amendment aspect of the case, *Dandridge* would control here.

*Dandridge,* however, did not reach classifications touching on associational rights that lie in the penumbra of the First Amendment. Since the "unrelated" person provision is not directed to the maintenance of the family as a unit but treats impoverished households composed of relatives more favorably than impoverished households having a single unrelated person, it draws a line that can be sustained only on a showing of a "compelling" governmental interest.

The "unrelated" person provision of the present Act has an impact on the rights of people to associate for lawful purposes with whom they choose. When state action "may have the effect of curtailing the freedom to

associate" it "is subject to the closest scrutiny." *NAACP* v. *Alabama,* 357 U. S., at 460–461. The "right of the people peaceably to assemble" guaranteed by the First Amendment covers a wide spectrum of human interests— including, as stated in *id.,* at 460, "political, economic, religious, or cultural matters." Banding together to combat the common foe of hunger is in that category. The case therefore falls within the zone represented by *Shapiro* v. *Thompson, supra,* which held that a waiting period on welfare imposed by a State on the "inmigration of indigents" penalizing the constitutional right to travel could not be sustained absent a *"compelling* governmental interest." *Id.,* at 631, 634.

MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE concurs, dissenting.

For much the same reasons as those stated in my dissenting opinion in *United States Department of Agriculture* v. *Murry, ante,* p. 522, I am unable to agree with the Court's disposition of this case. Here appellees challenged a provision in the Federal Food Stamp Act, 7 U. S. C. § 2011 *et seq.,* which limited food stamps to related people living in one "household." The result of this provision is that unrelated persons who live under the same roof and pool their resources may not obtain food stamps even though otherwise eligible.

The Court's opinion would make a very persuasive congressional committee report arguing against the adoption of the limitation in question. Undoubtedly, Congress attacked the problem with a rather blunt instrument and, just as undoubtedly, persuasive arguments may be made that what we conceive to be its purpose will not be significantly advanced by the enactment of the limitation. But questions such as this are for Congress, rather than for this Court; our role is limited to the

determination of whether there is any rational basis on which Congress could decide that public funds made available under the food stamp program should not go to a household containing an individual who is unrelated to any other member of the household.

I do not believe that asserted congressional concern with the fraudulent use of food stamps is, when interpreted in the light most favorable to sustaining the limitation, quite as irrational as the Court seems to believe. A basic unit which Congress has chosen for determination of availability for food stamps is the "household," a determination which is not criticized by the Court. By the limitation here challenged, it has singled out households which contain unrelated persons and made such households ineligible. I do not think it is unreasonable for Congress to conclude that the basic unit which it was willing to support with federal funding through food stamps is some variation on the family as we know it— a household consisting of related individuals. This unit provides a guarantee which is not provided by households containing unrelated individuals that the household exists for some purpose other than to collect federal food stamps.

Admittedly, as the Court points out, the limitation will make ineligible many households which have not been formed for the purpose of collecting federal food stamps, and will at the same time not wholly deny food stamps to those households which may have been formed in large part to take advantage of the program. But, as the Court concedes, "[t]raditional equal protection analysis does not require that every classification be drawn with precise 'mathematical nicety,'" *ante,* at 538. And earlier this Term, the constitutionality of a similarly "imprecise" rule promulgated pursuant to the Truth in Lending Act was chal-

lenged on grounds such as those urged by appellees here. In *Mourning* v. *Family Publications Service, Inc.,* 411 U. S. 356 (1973), the imposition of the rule on *all* members of a defined class was sustained because it served to discourage evasion by a substantial portion of that class of disclosure mechanisms chosen by Congress for consumer protection.

The limitation which Congress enacted could, in the judgment of reasonable men, conceivably deny food stamps to members of households which have been formed solely for the purpose of taking advantage of the food stamp program. Since the food stamp program is not intended to be a subsidy for every individual who desires low-cost food, this was a permissible congressional decision quite consistent with the underlying policy of the Act. The fact that the limitation will have unfortunate and perhaps unintended consequences beyond this does not make it unconstitutional.