598 F.2d 1055
 INDIANA WELFARE RIGHTS ORGANIZATION, INC., an Indiana
Corporation, Bonita Johnson, Catherine Phipps, on
behalf of themselves and all other
persons similarly situated,
Plaintiffs-Appellants,
v.
Robert BERGLAND, Individually and in his capacity as United
States Secretary of Agriculture, Wayne A. Stanton,
Individually and in his capacity as Administrator of the
Indiana Department of Public Welfare, Allen E. Greene,
Individually and in his capacity as Director of the Food
Stamp Division of the Indiana Department of Public Welfare,
Defendants-Appellees.
 No. 78-1898.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 8, 1978.
Decided March 30, 1979.
 
 William Marple, Legal Services Organization of Indiana, Inc., Indianapolis, Ind., for plaintiffs-appellants.
 Brien G. Kennedy, Dept. of Justice, Civ. Div., Washington, D. C., for defendants-appellees.
 Before FAIRCHILD, Chief Judge, and SWYGERT and TONE, Circuit Judges.
 FAIRCHILD, Chief Judge.
 
 
 1
 On December 1, 1977, this action was filed by Bonita Johnson, Jeanette Chrisman and Catherine Phipps, individual food stamp recipients, and the Indiana Welfare Rights Organization, an Indiana Corporation, as a nationwide class action, against the Secretary of Agriculture, Robert Bergland, and Indiana Welfare Officials Wayne Stanton and Allen Greene. The named plaintiffs claimed inability to pay the purchase price requirements of the food stamp program. Plaintiffs sought preliminary and permanent injunctive relief prohibiting defendants from delaying implementation of Section 8 of the Food Stamp Act of 1977 which eliminates the purchase price for food stamp benefits; declaratory relief that defendants' failure to implement Section 8 immediately violated plaintiffs' rights; and damages in the form of cash refunds of the purchase price that was paid after October 1, 1977 and up to the time when the purchase price is no longer required.
 
 
 2
 Statutory authority for the Food Stamp Program was formerly found in the Food Stamp Act of 1964, with amendments. 7 U.S.C. §§ 2011-2026 (1976). Section 2016(b) (§ 7(b) of the 1964 Act) provided in part: "households shall be charged for the coupon allotment issued to them, and the amount of such charge shall represent a reasonable investment on the part of the household, but in no event more than 30 per centum of the household's income . . . ." Pursuant to this provision and regulations thereunder, eligible households were required to purchase food stamps at a reduced rate based on their size and cumulative income. The households used the stamps to buy food, and the government has redeemed the stamps at face value, thereby paying the difference between the cost of the food and the "reasonable investment" paid by the household under the so-called purchase requirement.
 
 
 3
 Elimination of the purchase requirement, often referred to as EPR, was one of the reforms directed by Congress in the Food Stamp Act of 1977, part of the Food and Agriculture Act, P.L. 95-113, 91 Stat. 969. EPR has been characterized as the "most significant change" in the bill. H.R. Rep.No.95-464, 95th Cong., 1st Sess. at 239 (1977).
 
 
 4
 The 1977 Act took the form of an amendment of the 1964 Act, effective October 1, 1977. 7 U.S.C. § 2017 (Sec. 8 of the Act as amended) corresponds to 7 U.S.C. § 2016 before the amendment (Sec. 7 of the 1964 Act) and contains no purchase requirement, but does provide, in part, that the value of the allotment to eligible families shall be equal to the cost of the "thrifty food plan" reduced by an amount equal to 30 per centum of the household's income as determined in accordance with section 5 (7 U.S.C. § 2014). A sentence in 7 U.S.C. § 2017(a) is the only direct reference in the Act to EPR: "The Secretary shall, six months after the implementation of the elimination of the charge for allotments and annually thereafter, report to Congress the effect on participation and cost of this elimination."
 
 
 5
 Although Section 1301 of P.L. 95-113 made the amendment to the Food Stamp Act of 1964 effective October 1, 1977, Section 1303(a) demonstrated recognition that the Food Stamp Program is largely delineated by regulations which would need revision to reflect the statutory changes. Section 1303(a) provided in part: "The Secretary of Agriculture shall implement the Food Stamp Act of 1977 as expeditiously as possible consistent with the efficient and effective administration of the food stamp program. The provisions of the Food Stamp Act of 1964, as amended, which are relevant to current regulations of the Secretary governing the food stamp program, shall remain in effect until such regulations are revoked, superseded, amended, or modified by regulations issued pursuant to the Food Stamp Act of 1977. . . ."
 
 
 6
 Thus the reference to October 1, 1977 as an effective date was qualified so as to maintain former provisions in force until the change be reflected in regulations.
 
 
 7
 The Secretary sponsored public hearings, and sought confirmation and advice in various ways. On May 2, 1978 it published proposed rules covering changes, including EPR, which the Secretary considered closely interrelated and needing concurrent implementation. 43 Fed.Reg. 18874. On October 17, 1978, after revision, the final rules were published, requiring the state agencies to eliminate the purchase requirement for all households on or before January 1, 1979. Section 272.1(g)(1)(i).
 
 
 8
 It does appear that the Secretary more expeditiously worked out a change in the rule for giving effect to utility bills in connection with the Food Stamp Program. A rule governing the matter was published November 30, 1977, 42 Fed.Reg. 60916, effective January 1, 1978, and an amendment was filed January 11, 1978.
 
 
 9
 Plaintiffs apparently agreed that the statutory amendment eliminating the purchase requirement was not self-executing, but claimed that the Secretary and other defendants had a duty to implement 7 U.S.C. § 2017 immediately after October 1, 1977. Plaintiffs contend that the Act required the Secretary to separate EPR from all other changes if necessary to accomplish EPR immediately.
 
 
 10
 The district court addressed the matter on cross motions for summary judgment, and granted judgment for defendants June 30, 1978. The gist of the court's conclusion was as follows:
 
 
 11
 The Act is a comprehensive re-vamping of the food stamp program. Each section of the Act is substantially dependent upon the other sections of the Act. Section 1303(a) of the Act requires (defendant) Bergland to implement the Act as expeditiously as possible consistent with the efficient and effective administration of the food stamp program. That section does not require any section of the Act to be implemented sooner than any other section of the Act. Portions of the legislative history of the Act have been cited by the parties to support their respective positions, but the legislative history does not, and cannot, vary the plain language of the Act, particularly Section 1303(a) thereof.
 
 
 12
 We agree.
 
 
 13
 Initially plaintiffs sought an injunction prohibiting the defendants from failing to implement EPR immediately, virtually Mandamus. They also sought refunds of the purchase price paid by class members after October 1, 1977. By the date of argument of the appeal, November 8, 1978, the regulation had been issued and had provided for EPR by January 1, 1979. Accordingly, the request for mandatory relief is moot.
 
 
 14
 Plaintiffs do cite statements by individual Senators which support their view that immediate implementation of EPR, independently of other changes, was intended. One of several examples is a speech by Senator Leahy, a member of the subcommittee responsible for the bill. He said on September 9, 1977: "Because EPR is such an important gain, I hope it will be implemented as soon as possible after this bill's enactment. This reform is not dependent on other features of the bill, and thus does not have to wait until more complicated provisions are in place. I urge the Secretary not to delay in implementing the EPR provision." 123 Cong.Rec.S. 14570 (daily ed. September 9, 1977).
 
 
 15
 On the other hand, nothing in the text of the Act nor the Committee Reports suggests a duty of immediate or separate implementation, and the Secretary cites passages from the Reports evidencing the concept that the changes directed by the Act are interrelated.
 
 
 16
 Representative Foley, who chaired both the House and Conference Committees and was the bill's floorleader in the House, commented concerning court actions brought to seek loopholes in the bill: "But, if the courts should confront such cases, we trust that they will read and construe this new food stamp law in light of our intent to trust its management to the Department of Agriculture operating in good faith and under the guidance of our legislative dictates." 123 Cong.Rec.H. 9535 (daily ed. September 16, 1977).
 
 
 17
 The Secretary argues persuasively that portions of the Act and the program contemplated support the close relationship between EPR and other changes.
 
 
 18
 Thus under the 1964 Act, a household participating in the Food Stamp Program received a "coupon allotment" equal to the cost to the household of a "nutritionally adequate diet," 7 U.S.C. § 2016(a) (1976). Households with income (after deductions, See 7 C.F.R. § 271.3(c) (1977)) greater than the "zero-purchase" level were charged an amount for the coupons that "represent(s) a reasonable investment on the part of the household, but in no event more than 30 per centum of the household's income." 7 U.S.C. § 2016(b) (1976); See 7 C.F.R., pt. 271 apps. A-F (1977). The food stamps were used by recipients "to purchase food at retail stores, and the government redeems the stamps at face value, thereby paying the difference between the actual cost of the food and the amount paid by the household for the stamps." United States Department of Agriculture v. Moreno, 413 U.S. 528, 530, 93 S.Ct. 2821, 2823, 37 L.Ed.2d 782 (1973).
 
 
 19
 Under the 1977 Act, no purchase requirement is charged for the coupons but the face value of the coupons is reduced "to the cost to such households of the thrifty food plan,[1] as determined in accordance with Section 5 of the Act. . . ." Food Stamp Act of 1977, § 8(a), 7 U.S.C. § 2017.[2] Section 5 contains detailed requirements for financial eligibility to participate in the program and describes the level of available benefits. Thus, the implementation of EPR is textually limited to the implementation of Section 5. A House report noted: "(t)he committee bill will add approximately 1,749,000 new people with net incomes below the poverty level to the program. The net effect of this addition offset by the elimination of 1,344,000 non-needy is to add 405,000 individuals." H.R.Rep.No.95-464, at 4. The Secretary argues that had EPR been implemented before the other reforms as plaintiffs urged, the Food Stamp Program would have been significantly inflated by the addition of more needy persons without the elimination of the non-needy and the congressional objectives of a simplified, efficient, and cost-effective program would have been undermined.
 
 
 20
 Deference is due the interpretation given to a statute by the agency charged with its administration. " 'Particularly is this respect due when the administrative practice at stake "involves a contemporaneous construction of a statute by the man charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new." ' " Udall v. Tallman, 380 U.S. 1, 16, 82 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).
 
 
 21
 The Act did not expressly require immediate implementation of EPR, separate from implementation of other changes. We are satisfied that no such duty was implied.
 
 
 22
 The duty which was imposed by Section 1303(a) of the Act was to "implement . . . as expeditiously as possible consistent with the efficient and effective administration of the . . . program."
 
 
 23
 Another section, 7 U.S.C. § 2013(c), required the Secretary to promulgate all regulations in accordance with the procedures set forth in Section 553 of Title 5 (Rule Making).[3]
 
 
 24
 Once one accepts the Secretary's right to deal with EPR along with the other matters covered in the October, 1978 rule, it would be most difficult to demonstrate that he failed in his duty of expeditious implementation, assuming the appropriateness of judicial review. Surely there has been no such demonstration.
 
 
 25
 Plaintiffs asked the district court to permit the action to be maintained on behalf of all applicants in the United States required to pay a purchase requirement. The court limited the class to persons in Indiana. Plaintiffs have argued on appeal that this limitation of the class was erroneous.
 
 
 26
 In view of the outcome, unfavorable to the class as limited, we perceive no reason for deciding whether a larger class of plaintiffs should have been certified.
 
 
 27
 The judgment appealed from is Affirmed.
 
 
 
 [1]
 7 U.S.C. § 2012. Thrifty food plan
 (O ) "Thrifty food plan" means the diet required to feed a family of four persons consisting of a man and a woman twenty through fifty-four, a child six through eight, and a child nine through eleven years of age, determined in accordance with the Secretary's calculations. The cost of such diet shall be the basis for uniform allotments for all households regardless of their actual composition, except that the Secretary shall (1) make household-size adjustments taking into account economies of scale, . . . (4) adjust the cost of such diet every January 1 and July 1 to the nearest dollar increment to reflect changes in the cost of the thrifty food plan for the six months ending the preceding September 30 and March 31, respectively.
 
 
 [2]
 7 U.S.C. § 2017. Eligible households
 (a) Participation in the food stamp program shall be limited to those households whose incomes and other financial resources, held singly or in joint ownership, are determined to be a substantial limiting factor in permitting them to obtain a more nutritious diet. . . .
 (b) The Secretary shall establish uniform national standards of eligibility for participation by households in the food stamp program in accordance with the provisions of this section. . . .
 (c) The income standards of eligibility shall be the non-farm income poverty guidelines prescribed by the Office of Management and Budget adjusted annually pursuant to section 625 of the Economic Opportunity Act of 1964, as amended (42 U.S.C. 2971d) (42 USCS § 2971d) . . . . Provided further, That the income poverty guidelines for the period commencing July 1, 1978, shall be made as up to date as possible by multiplying the income poverty guidelines for 1977 by the change between the average 1977 Consumer Price Index and the Consumer Price Index for March 1978, utilizing the most current procedures which have been used by the Office of Management and Budget, and the income poverty guidelines for future periods shall be similarly adjusted.
 (d) Household incomes for purposes of the food stamp program shall include all income from whatever source excluding only (1) any gain or benefit which is not in the form of money payable directly to a household, (2) any income in the certification period which is received too infrequently or irregularly to be reasonably anticipated, but not in excess of $30 in a quarter, (3) all educational loans on which payment is deferred, grants, scholarships, fellowships, veterans' educational benefits, and the like to the extent that they are used for tuition and mandatory school fees at an institution of higher education or school for the handicapped, (4) all loans other than educational loans on which repayment is deferred, (5) reimbursements which do not exceed expenses actually incurred and which do not represent a gain or benefit to the household, (6) moneys received and used for the care and maintenance of a third-party beneficiary who is not a household member, (7) income earned by a child who is a member of the household, who is a student, and who has not attained his eighteenth birthday, (8) moneys received in the form of nonrecurring lump-sum payments, including, but not limited to, income tax refunds, rebates, or credits, retroactive lump-sum social security or railroad retirement pension payments and retroactive lump-sum insurance settlements: Provided, That such payments shall be counted as resources, unless specifically excluded by other laws, (9) the cost of producing self-employed income, and (10) any income that any other law specifically excludes from consideration as income for the purpose of determining eligibility for the food stamp program.
 (e) In computing household income, the Secretary shall allow a standard deduction of $60 a month for each household, . . . . Such standard deductions, starting July 1, 1978, shall be adjusted every July 1 and January 1 to the nearest $5 to reflect changes in the Consumer Price Index of the Bureau of Labor Statistics for items other than food for the six months ending the preceding March 31 and September 30, respectively. All households with earned income shall be allowed an additional deduction of 20 per centum of all earned income (other than that excluded by subsection (d) of this section), to compensate for taxes, other mandatory deductions from salary, and work expenses. Households shall also be entitled to (1) a dependent care deduction, the maximum allowable level of which shall be the same as that for the excess shelter expense deduction contained in clause (2) of this subsection, for the actual cost of payments necessary for the care of a dependent, regardless of the dependent's age, when such care enables a household member to accept or continue employment, or training or education which is preparatory for employment, or (2) an excess shelter expense deduction to the extent that the monthly amount expended by a household for shelter exceeds an amount equal to 50 per centum of monthly household income after all other applicable deductions have been allowed . . . .
 (f) Household income shall be calculated by the State agency for the purpose of determining household eligibility. The State agency in calculating household income shall take into account the income reasonably anticipated to be received by the household in the certification period for which eligibility is being determined and the income which has been received by the household during the thirty days preceding the filing of its application for food stamps so that the State agency may reasonably ascertain the income that is and will be actually available to the household for the certification period . . . .
 (g) The Secretary shall prescribe the types and allowable amounts of financial resources (liquid and nonliquid assets) an eligible household may own, and shall, in so doing, assure that a household otherwise eligible to participate in the food stamp program will not be eligible to participate if its resources exceed $1,750, or, in the case of a household consisting of two or more persons, one of whom is age 60 or over, if its resources exceed $3,000. The Secretary shall, . . . (1) include in financial resources any boats, snowmobiles, and airplanes used for recreational purposes, any vacation homes, any mobile homes used primarily for vacation purposes, and any licensed vehicle (other than one used to produce earned income) used for household transportation or used to obtain or continue employment or to transport disabled household members to the extent that the fair market value of any such vehicle exceeds $4,500, and (2) study and develop means of improving the effectiveness of these resource requirements in limiting participation to households in need of food assistance, . . . .
 (h)(1) The Secretary shall, after consultation with the official empowered to exercise the authority provided for by section 302(a) of the Disaster Relief Act of 1974 (42 USCS § 5142(a)), establish temporary emergency standards of eligibility for the duration of the emergency for households who are victims of a disaster which disrupts commercial channels of food distribution, . . . .
 (2) The Secretary shall establish a Food Stamp Disaster Task Force, to assist States in implementing and operating the disaster program, which shall be available to go into a disaster area and provide direct assistance to State and local officials.
 
 
 [3]
 5 U.S.C. § 553
 (b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include
 (1) a statement of the time, place, and nature of public rule making proceedings;
 (2) reference to the legal authority under which the rule is proposed; and
 (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved. . . .
 (c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. . . .
 (d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except
 (1) a substantive rule which grants or recognizes an exemption or relieves a restriction;
 (2) interpretative rules and statements of policy; or
 (3) as otherwise provided by the agency for good cause found and published with the rule.
 (e) Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.