BEA, Circuit Judge, dissenting; The Second Amendment right to “keep and bear arms” would not mean much unless one could lawfully purchase and use arms. Section 17.54.131 of the Alameda County Ordinance Code (the “Ordinance”) targets firearm stores; it prohibits them within 500 feet of residences. When a government regulation affects one’s right to purchase and use a firearm, it may be challenged as impeding the exercise of the Second Amendment right. To determine the validity of such a regulation, we turn to Supreme Court and Ninth Circuit precedents for guidance. Those precedents require we first determine whether the regulation—here, the Alameda ordinance—burdens the right granted by the Second Amendment. If it does, we next examine whether there is a specific governmental interest to be served to justify the burden. If there is, we then measure how severely the right is burdened, to see how much judicial scrutiny into the workings of the regulation is ¡required. The majority opinion short-circuits this process by making two errors. First, it holds that the Alameda ordinance does not “meaningfully” burden the right to purchase and use firearms because other gun stores are nearby Appellants’ proposed location. Second, it holds that Appellants have no Second Amendment rights to sell firearms. I’ll deal with these two errors in turn. I. In rejecting the panel opinion’s conclusion that the Ordinance burdens the right to buy guns, today’s majority does not deny that such a right exists. Rather, it concludes only that Appellants fail sufficiently to allege a violation of that right because there are other gun sellers near the location of their proposed gun store, including á Big 5 Sporting Goods store just 600 feet away.' For the majority, &■. challenge to the Alameda Ordinance requires that the Ordinance be not just a burden to the exercise of Second Amendment rights, but a “meaningful ],” Majority Op. 680, or “substantial,” Majority Op. 680-81, burden before any type of judicial scrutiny, beyond the very permissive “rational review” standard, be applied. This requirement misreads our precedent in United States v. Chovan, 735 F.3d 1127 (9th Cir. 2013) in two ways. First, Chovan did not require the burden to be “meaningful” or “substantial” to proceed to the second step in the analysis, the “severity” of the burden, It required only that the right be burdened. Second, Chovan explicitly required the “severity” of the burden to be examined at its second step, .as necessary to choose the level of judicial scrutiny to be applied. Id. at 1138. Here, when read in the light most favorable to Appellants,[1] the first amended complaint does allege a burden on' their prospective customers’ Second Amendment rights:[2] It alleges a burden on the ability of those prospective customers to obtain training, repairs, and other gun-related services at the same location at which they buy their firearms. Teixeira v. County of Alameda, 822 F.3d 1047, 1056 (9th Cir. 2016); see also Ezell v. City of Chicago, 651 F.3d 684, 696-97 (7th Cir. 2011) (rejecting Chicago’s argument that its ban on firearms ranges passed constitutional muster because residents could travel outside the city to satisfy their needs elsewhere, explaining that “[t]he pertinent question is whether the Second Amendment prevents the City Council from banning firing ranges everywhere in the city; that ranges are present in neighboring jurisdictions has no bearing on this question”). Just as Chicago could not outlaw target ranges in Chicago, Alameda County could not outlaw combined firearm sales, training, licensure, smithy and storage services in the unincorporated areas of Alameda County. In rejecting this burden, the majority concludes that the Second Amendment does not guarantee a particular “retail experience” to a gun buyer. See Majority Op. 680 n.13. This characterization of the services to be offered by Appellants pooh-poohs the alleged needs and demands of the firearm buyers to meet those several needs and demands at a single gun store. The majority assumes there is no advantage gained, nor burden lessened, to firearm customers in the exercise of their Second Amendment rights in being able to receive training, establish licensure to possess firearms, obtain smithy and maintenance services, and deposit firearms all in one place. But combining the sales of products with services necessary for their use is not merely a “retail experience”; it is an essential form to meet the “needs and demands” of customers. See Venkatesh Shankar, Leonard L. Berry, and Thomas Dotzel, A Practical Guide to Combining Products and Services, Harvard Business Review (November 2009) (“These days, many firms are trying to mix products with services in an effort to boost revenue and balance cash flows. ... Such offerings are commonplace—think Apple (the iPod product combined with the iTunes service) and Xerox (copiers and printers bundled with maintenance or customer support services).”). Would it be a burden for a burglary victim to be required to make an actionable crime report separately at City Hall, the Hall of justice and the local police station, rather than call “911?” Or would the majority simply tell the burgled homeowner that he wasn’t burdened by having to visit three municipal offices because he wasn’t entitled to a particular “citizen’s experience?” The burden exists and was sufficiently alleged. The proper analysis under Chovan is as to the severity of the burden. But of course, if one were to admit that a “burden” existed as to the customers’ Second Amendment rights, one would have to consider the severity of such burden under an intermediate or strict scrutiny test, rather than the permissive “rational review” standard invoked by the majority opinion. And that judicial scrutiny the majority opinion avoids altogether by erroneously, in my view, finding that the customers’ Second Amendment rights were not “meaningfully” burdened. Were one to find that yes, the customers’ Second Amendment rights were at least lightly burdened, under Chovan intermediate scrutiny would have to be employed to analyze the validity of Alameda County’s actions. The first question would be whether the County has a “substantial”[3] governmental interest in prohibiting gun stores to be located within 500 feet of residences. What could that substantial interest be? The majority (albeit perhaps inadvertently) supplies the answer in its first sentence: “to preserve the health and safety of its residents.” Majority Op. 673; see also Teixeira, 822 F.3d at 1060-61 (recognizing that one of the Ordinance’s asserted purposes was “protecting public safety and preventing harm in populated, well-traveled, and sensitive areas”). There are two problems with invoking this “health and safety” claim as a “substantial governmental interest” to justify the red-lining of Appellants’ gun store. First, Appellants’ complaint clearly alleges that even the County doesn’t believe such purported justification; thus it is pre-textual. See Romer v. Evans, 517 U.S. 620, 632, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (holding that a regulation “lack[ed] a rational relationship to legitimate state interests” because “its sheer breadth is so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects”); U.S. Dep’t of Agriculture v. Moreno, 413 U.S. 528, 534, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973) (“[A] bare ... desire to harm a politically unpopular group cannot constitute a legitimate governmental interest.”). The complaint recounts the “adoptive admissions and/or undisputed facts regarding the [Alameda County Community Development Agency] Planning Department’s findings.” Among those admissions and undisputed facts, we find: “Will the use [the proposed gun store], if permitted, under all circumstances and conditions of this particular case, materially affect adversely the health or safety of persons residing or working in the vicinity, or be materially detrimental to the public welfare or injurious to property or improvements in the neighborhood?” The County answers: “No.” As is said in Spain, “Mas claro, ni el agua” (Not even water could be clearer). This admission by the County calls into question whether the Ordinance would pass even the “rational review” test, redolent as it is in deference to government regulation. It is much less likely that the health and safety of Alame-da residents can be stated with a straight face as a “substantial” or “compelling” justification for the regulation as-is required under the intermediate scrutiny test. No sociological study is needed to assert that gun buyers and gun sellers constitute a “politically unpopular group” in Alameda County within the meaning of Moreno. That the vote to deny Appellants’ variance was purely political, and not based on an independent finding of danger to citizens, is confirmed by the record’s utter lack of even the most minimal explanation for the Supervisors’ vote. Second, there is nothing in the record which intimates that locating a gun store within 500 feet of a residence creates any risk to the residents. The employees of a gun store are all background checked. The purchasers must prove proper backgrounds to buy. Our “intermediate scrutiny” jurisprudence requires some type of proof of risk of the harm the government seeks to prevent to justify its prohibitive regulation. Thus, in Chovan statistical studies of recidivism in domestic violence offenders provided the proof of a substantial governmental health and safety interest in prohibiting domestic violence mis-demeanants from possessing firearms. Chovan, 735 F.3d at 1140-41. Likewise, in Jackson, a legislative finding that “hollow-point bullets are designed to tear larger wounds in the body by flattening and increasing in diameter on impact” was sufficient to establish that a ban on the sale of such ammunition furthered San Francisco’s asserted interest of “reducing the fatality of shootings.” Jackson, 746 F.3d at 969 (internal quotation marks omitted); see also Ezell, 651 F.3d at 709 (rejecting Chicago’s argument that “firing ranges create the risk of accidental death or injury and attract thieves wanting to steal firearms” because the city had “produced no empirical evidence whatsoever and rested its entire defense of [its] range ban on speculation about accidents and theft”). Here, as in Ezell, the majority merely speculates that the proximity of guns, in a gun store, threatens the County residents’ health and safety. The County doesn’t even speculate. Not only do the Planning Department of the County’s Community Development Agency and the West County Board of Zoning Adjustments categorically deny that the threat exists, but ironically, it is just the other way around: As noted in the panel’s now-vacated decision, it is precisely in residences where the core Second Amendment right to keep and bear arms is most pronounced and protected. See Teixeira, 822 F.3d at 1061.- The closer the store to residences, the easier for residents to-buy guns and the safer the residences. In sum, this case does not present merely a “zoning dispute” dressed up in Second Amendment garb. Id. at 1064, (Silverman, J., dissenting). If there were a zoning measure of general application to bar retail stores of any kind within 600 feet of residences to lower traffic or noise, we wouldn’t be here. But when law-abiding citizens are burdened in the exercise of their Second Amendment rights' to purchase firearms and train, license, and maintain them for their self-defense, thé Government must justify its' actions by proving the existence of a substantial governmental interest and that its regulation is reasonably tailored to achieve such interest—the intermediate scrutiny test. See Jackson, 746 F.3d at 965. That, it has not done. H. The panel opinion persuasively lays out the historical evidence demonstrating that the right to sell firearms is “part and parcel of the historically recognized right to keep and to bear arms.” See Teixeira, 822 F.3d at 1054-56 (citing, inter alia, a law in colonial Virginia providing for the “liberty to sell armes and ammunition to any of his majesties loyall subjects inhabiting this colony”; Thomas Jefferson’s observation in 1793 that “our citizens have always been free to make, vend, and export arms”; and an 1871 Tennessee Supreme Court decision which recognized that “the right to keep arms, necessarily involves the right to purchase them” (internal quotation marks, brackets, and citations omitted)). I will not rehash that historical evidence here. Instead, I will address. the majority’s assertion that the language of District of Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), is “opaque” regarding the Second Amendment’s application to “conditions and qualifications on the commercial sale of firearms.” Majority Op. 26. In my view, Hellers language is perfectly clear: such regulations are “presumptively lawful” only if they are “longstanding.” Heller, 554 U.S. at 626-27, 128 S.Ct. 2783; see also Teixeira, 822 F.3d at 1056-58. In Heller, the Supreme Court recognized for the first time that the Second Amendment protects “an individual right to keep and bear arms.” Heller, 554 U.S. at 595,128 S.Ct. 2783. The Court then said the following about the scope of that right: Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of. firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms. Id. at 626-27, 128 S.Ct. 2783 (emphasis added). Then, in a footnote, the Court added: “We identify these presumptively law-fid regulatory measures only as examples; our list does not purport to be exhaustive.” Id, at 627 n.26, 128 S.Ct. 2783 (emphasis added). In my view, the County cannot avail itself of the italicized limitations for “longstanding ... laws imposing, conditions and qualifications on the commercial sale of arms,” because it has failed to carry its burden of establishing that the- Ordinance is “longstanding” or is in a class of longstanding prohibitions as to the location of firearms sales and services in, particular. Indeed, the County has offered no evidence demonstrating that the Ordinance is the kind of regulation which Americans would have seen as permissible at the time of the adoption of the Second Amendment. See Teixeira, 822 F.3d at 1058. Though the majority has unearthed its own historical narrative to that effect, see Majority Op. 683-87, none of those materials were presented by the County to the district court or in the County’s brief on appeal. There can be no doubt that evidence the regulations are “longstanding” is required to claim Heller’s carve-out for “presumptively lawful” “conditions and qualifications on the commercial sale of arms.” In the above-quoted passage from Heller, the object of the preposition “on” in the phrase “cast doubt on” is a disjunctive parallel construction: “longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.” Thus, under the series-qualifier canon, the adjective “longstanding” applies to each phrase within the parallelism—including “laws imposing conditions and qualifications on the commercial sale of'arms.” See Antonin Scalia and Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 147-151 (West 2012). True, if the adjective “longstanding” describes “laws imposing conditions and qualifications on the commercial sale of arms,” rather than qualifying that phrase, then historical evidence would not be necessary to claim the carve-out. But this reading is untenable, because then any law “imposing conditions and qualifications on the commercial sale of arms” would be “longstanding”—even if it were invented and enacted yesterday. “Longstanding” therefore tells us which “laws imposing conditions and qualifications on the commercial sale of arms” are “presumptively lawful,” and the County has failed to demonstrate that the Ordinance falls within this category. See also Teixeira, 822 F.3d at 1058 (“That the Nation’s' first comprehensive zoning law did not come into existence until 1916, while not dispositive, provides at least some evidence that Alameda County’s Conditional Use Permit requirement is not heir to a longstanding class of historical prohibitions or regulations.”). Thus, neither the .historical' evidence nor the language of Heller supports the majority’s conclusion that the Second Amendment offers no protection against regulations on the sale of firearms. I respectfully dissent. . See Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 109, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979) (on a motion to dismiss, "[w]e ... construe the complaint in favor of the complaining party” (internal quotation marks and ellipses omitted)). . The complaint alleges that "a full service gun store located in San Lorenzo,” of the kind contemplated by Appellants, "would be a success, in part, because existing retail establishments ... do not meet customer needs and demands.” Specifically, the existing "general sporting good stores” do not provide "personalized training and instruction in firearm safety and operation” as well, as "arms and ammunition.” . See Jackson, 746 F.3d at 965 (identifying "the first prong of intermediate scrutiny review” as an inquiry into "whether the government’s stated objective is significant, substantial, or important” (emphasis added)).