David **SILBERMAN, Fanny Silberman and Stephen Jay Silberman,**
**Plaintiffs,**

v.

Abraham **BIDERMAN, Commissioner of the City of New York Department of Housing Preservation and Development, the City of New York Department of Housing Preservation and Development, the City of New York and Cadman Towers, Inc., Defendants.**

No. CV–89–1736 (RJD).

United States District Court,
E.D. New York.

April 17, 1990.

**1140**

Jerold W. Dorfman and Anthony Y. Cheh, Faust, Rabbach & Stanger, New York City, for plaintiffs.

Andrea Roschelle, Corp. Counsel of the City of New York, for defendants Abraham Biderman, the City of New York Dept. of Housing Preservation and Development, and the City of New York.

Ezra Goodman, Szold & Brandwen, New York City, for defendant Cadman Towers, Inc.

## MEMORANDUM AND ORDER

DEARIE, District Judge.

Plaintiffs challenge housing regulations promulgated by the City of New York Department of Housing Preservation and Development ("HPD") and applicable to Cadman Towers, Inc. ("Cadman Towers") on the grounds that the regulations violate the Due Process, Equal Protection and Takings Clauses of the Fourteenth Amendment as well as 42 U.S.C. § 1983 (1982); they also mount state-law claims based on Article 78 of New York's Civil Practice Law and Rules, N.Y.Civ.Prac.L. & R. §§ 7801 *et seq.* (McKinney 1981), and on the New York State Constitution. BACKGROUND: Plaintiffs David Silberman ("David") and Fanny Silberman ("Fanny") are a married couple in their eighties. Plaintiff Stephen Silberman ("Stephen"), age 26, is their grandson. David and Fanny are shareholders of Cadman Towers and have resided there for many years. Defendant Cadman Towers is a cooperative housing company organized under Article 2 of New York's Private Housing Finance Law, N.Y.Priv. Hous.Fin.Law §§ 10–37 (McKinney 1976) (the "Mitchell–Lama Law"), financed by loans from New York City and, pursuant to Sections 23 and 32 of the Mitchell–Lama Law, N.Y.Priv.Hous.Fin.Law §§ 23, 32 (McKinney 1976), is subject to regulation by HPD.

Approximately four years ago, Stephen moved in with David and Fanny, apparently motivated in part by David's poor health. David and Fanny would customarily spend the winter months in Florida, during which time Stephen would live alone in their apartment. In November of 1987,[1] while in Florida, David suffered a severe stroke, apparently his third; as a result, he has not been able to travel back to New York, and Fanny has remained in Florida with him. While David is confined to a wheelchair and has significant after-effects of his stroke, his prognosis is guardedly optimistic, and he hopes to return to New York in the not-too-distant future.

HPD has promulgated regulations (the "Regulations") applicable to housing companies subsidized by New York City pursuant to the Mitchell–Lama Law, including Cadman Towers. Pursuant to Article II, Section 15 of the Regulations, a tenant/cooperator may "co-occupy" an apartment with a person other than another tenant/cooperator, provided he or she first obtains written permission from the housing company and from HPD.[2] As a gener-

---

1. This is the date given in an affidavit by Fanny. In the Complaint, the date given was March of 1988.

2. As used herein, the term "tenant/cooperator" includes any person who is a leaseholder or owner of co-op shares, and the term "occupant" includes any other person who occupies an apartment with a tenant/cooperator, regardless

al matter, prior to moving in, the occupant must execute an occupancy agreement in a form approved by HPD. The situation is somewhat different for members of the "immediate family" [3] of a tenant/cooperator. No permission is required to co-occupy an apartment with a spouse or minor child; for parents, or children who have reached their majority, however, prior written permission is required. The record does not reveal whether plaintiffs applied for permission prior to Stephen's moving in; however, he has lived there for a number of years during which time Cadman Towers has not challenged his occupancy.

The Regulations require that each tenant/cooperator and each occupant (whether or not a member of the tenant/cooperator's immediate family) submit certain financial information on an annual basis; if rent or maintenance charges are based on income, the income of the occupant will be included in the calculation. Plaintiffs have for the last four years submitted reports to Cadman Towers containing information about Stephen's income.

Article VI, Section 3 of the Regulations provides that a member of the immediate family of a tenant/cooperator may become a co-owner of shares if (i) the individual has been a bona fide resident of the apartment for at least two years, during which time the apartment was such individual's primary residence, (ii) the individual's income

has been included in income affidavits filed annually by the tenant/cooperator, and (iii) both the individual and the shareholder intend to remain in joint occupancy. Plaintiffs claim that for several years they have attempted to have Stephen listed as a co-owner of David and Fanny's shares in Cadman Towers, and to have Stephen's name added to their occupancy agreement. Plaintiffs have submitted documentation regarding one such request, in 1988; this was rejected on the ground that HPD's regulations do not permit grandchildren to become joint owners of their grandparents' co-op shares. *See* Exhibit F to Plaintiffs' Motion for Preliminary Injunction.

In March of 1989 Cadman Towers commenced proceedings to evict the Silbermans on the grounds that (i) David and Fanny were no longer using the apartment as their primary residence [4] and (ii) Stephen was illegally occupying the apartment.[5] In early May of 1989 plaintiffs were served with a notice that a hearing had been scheduled in this matter before an HPD Hearing Officer for June 1, 1989. Plaintiffs brought this action on May 25, 1989, by way of an order to show cause. On June 13, 1989, this Court approved a stipulation by which the parties agreed that the HPD hearing would be adjourned until plaintiffs' motion for a preliminary injunction was determined. On July 14, 1989, HPD cross-moved for dismissal. The parties have agreed that the plaintiff's motion

of that person's relationship to the tenant/cooperator.

3. Article II, Section 16(a) defines "immediate family" to mean "parents, spouses and children, including adopted children, of the tenant/cooperator."

4. Article II, Section 14 of the Regulations requires that a tenant/cooperator continue to maintain an apartment as his or her primary place of residence. In determining whether this is the case, the facts to be considered include but are not limited to whether the cooperator (i) specifies another address on official documents such as tax returns, driver's licenses, motor vehicle registration and the like, (ii) uses a different address as a voting address, (iii) sublets the apartment without written permission, or attempts to assign the apartment, and (iv) spent less than 183 days at the apartment in the preceding year.

5. Article XVII, Section 1 of the Regulations provides that a housing company may not initiate eviction proceedings without first obtaining a certificate of eviction from HPD following an administrative hearing by an HPD hearing officer. The Regulations require the housing company to serve the tenant/cooperator with a notice for grounds of eviction informing the tenant/cooperator, among other things, of his or her opportunity to challenge the grounds for eviction at the HPD hearing. In the event the HPD hearing officer issues a certificate of eviction, there is no further internal review, but HPD's action may be challenged through an Article 78 proceeding. Once having obtained a certificate of eviction, the housing project must then commence a summary proceeding pursuant to N.Y. Real Prop. Acts. § 701 (McKinney 1979); the tenant/cooperator may appeal an adverse decision to the New York Appellate Term.

should be treated as a request for a permanent injunction; thus the merits of plaintiff's constitutional claims are now before the Court.

DISCUSSION

1. *Due Process:* Plaintiffs argue that the Regulations, by excluding grandchildren such as Stephen from the definition of "immediate family", violate the Due Process Clause of the Fourteenth Amendment in that they impermissibly intrude on the ability of the Silbermans to maintain their integrity as a family. In support of their argument, plaintiffs cite *Moore v. City of East Cleveland, Ohio,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977). In that case, the Supreme Court struck down a city ordinance which limited occupancy to "family" members, defined "family" in such a way as to exclude a grandson from his grandmother's "family", and criminalized violations of the ordinance.

■ *Moore* is part of a long tradition insulating the "private realm of family life", *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944), from intrusive regulation by the state. The Supreme Court has repeatedly made it clear that activities which are fundamental to the existence and integrity of families and their ability to "inculcate and pass down ... [their] most cherished values", *Moore,* 431 U.S. at 504–05, 97 S.Ct. at 1938–39, can only be regulated if they stand up to a careful examination of "the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation". *Id.* at 499, 97 S.Ct. at 1936.[6] As *Moore* has made clear, the protection accorded the "family" under the Due Process Clause is not limited to members of the nuclear family: "[t]he tradition of uncles, aunts, cousins, and especially grandparents sharing a household along with parents and children has roots equally venerable and equally deserving of constitutional recognition." *Id.* at 504, 97 S.Ct. at 1938.

■ The question for this Court, therefore, is twofold: whether HPD's Regulations interfere with any right of plaintiffs which is so fundamental to the integrity of their family as to warrant the strict scrutiny applied in *Moore* and, if not, whether the Regulations otherwise run afoul of the standards generally applied under the Due Process Clause in cases not involving fundamental interests.[7]

■ In this case, plaintiffs' interests simply do not fall within the scope of *Moore* or any other case in the tradition of which it is a part. It is apparent that the Regulations do not and have not prevented Stephen from living with his grandparents; indeed, as defendants have pointed out, the only obstacle to their living together is David's and Fanny's continued presence in Florida. Further, defendants have conceded that if David and Fanny were to

---

**6.** This protection extends to a wide range of activities, including the freedom to marry, *Loving v. Virginia,* 388 U.S. 1, 12, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967), or remarry, *Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978), to have children, *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942), to teach one's children a particular language, *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923), to send one's children to a school of one's choice, *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), to retain custody of one's children, *Stanley v. Illinois,* 405 U.S. 645, 652, 92 S.Ct. 1208, 1213, 31 L.Ed.2d 551 (1972), and to choose not to have children, *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

**7.** Defendants have attempted to distinguish this case from *Moore* on the ground that the ordi-

nance in that case imposed criminal penalties, whereas the Regulations at issue here do not. A principle as fundamental as that expressed in *Moore* cannot be so easily limited. The Supreme Court in *Moore,* when faced with a similar attempt to distinguish it from cases based on *Meyer* and *Pierce,* noted that "unless we close our eyes to the basic reasons why certain rights associated with the family have been accorded shelter under the Fourteenth Amendment's Due Process Clause, we cannot avoid applying the force and rationale of these precedents to the family choice involved in this case." *Moore,* 431 U.S. at 501, 97 S.Ct. at 1936. While the fact that the ordinance at issue in *Moore* criminalized Mrs. Moore's behavior may have made it easier for the Court to reach its decision, that factor should not limit the reach of that case to criminal statutes. *But see Braunstein v. Dwelling Managers, Inc.,* 476 F.Supp. 1323, 1331 (S.D.N.Y. 1979).

return to New York, or if HPD were to determine that New York is still David's and Fanny's primary residence, then Stephen would be able to continue to live in the apartment, albeit not as a co-owner. In view of this, the question is whether those provisions of the Regulations which prevent Stephen from becoming a co-owner constitute an "intrusive regulation of the family", *Moore*, 431 U.S. at 499, 97 S.Ct. at 1935, warranting heightened scrutiny. The Court does not believe that they do. While the family is given significant protection under the Constitution, this by no means immunizes it from reasonable state regulation. *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944); *Runyon v. McCrary*, 427 U.S. 160, 177–178, 96 S.Ct. 2586, 2597–2598, 49 L.Ed.2d 415 (1976). In essence, *Moore* and cases in the same tradition act as a check on the ability of the state to interfere with activities whereby families "inculcate and pass down ... [their] most cherished values", *Moore*, 431 U.S. at 504–05, 97 S.Ct. at 1938–39. Unquestionably, the availability of a subsidized apartment is of great value to plaintiffs. However, whether David and Fanny can pass that apartment to Stephen, or whether he can obtain an interest in it, merely raises a question of the right—or lack thereof—to transfer or acquire an interest in a peculiar species of property, a government-subsidized apartment; it does not implicate Stephen's ability to live with his grandparents, or their right, as a family, to cultivate and hand down their values, beliefs or culture, free from undue state interference. Plaintiffs' interests, while substantial, simply are not comparable with the rights at stake in *Moore* or kindred cases.

■ Under these circumstances, the Due Process Clause only requires that the challenged Regulations exhibit a "rational relationship to permissible state objectives". *Moore*, 431 U.S. at 498, 97 S.Ct. at 1935. This question is very similar to one addressed at length in the discussion of plaintiffs' Equal Protection Clause claims; on the basis of that discussion, the Court finds that the Regulations do not in any way violate the Due Process Clause.

2. *Equal Protection:* If Stephen were David's and Fanny's son, HPD regulations would permit him to become a co-owner of the co-op shares, in which case his ability to remain in the apartment would not depend on David's and Fanny's primary residence; however, since Stephen is David's and Fanny's grandson, the Regulations prohibit him from becoming a co-owner. Plaintiffs assert that such a classification is violative of the Fourteenth Amendment's Equal Protection Clause. Their argument has three separate components. First, they assert that the definition of "family" in the HPD regulations, when compared with other New York statutes and with regulations for Mitchell–Lama housing promulgated by the New York State Division of Housing and Community Renewal ("DHCR"), is irrational. Second, according to plaintiffs, the purpose of the regulations asserted by HPD is contrary to the statute's purpose of protecting the family. Third, they argue that even if the validity of the purpose asserted by HPD is accepted, the regulations are not rationally related to that purpose.

■ The Equal Protection Clause, of course, does not preclude legislatures from creating classifications which result in differential treatment; rather, it requires "that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). Generally, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Id.* at 440, 105 S.Ct. at 3254. This "presumption is not present when a State has enacted legislation whose purpose or effect is to create classes [which are] inherently suspect. In the absence of invidious discrimination, however, a court is not free ... to substitute its judgement for the will of the people of a State as expressed in the laws...." *Parham v. Hughes*, 441 U.S. 347, 351, 99 S.Ct. 1742, 1745, 60 L.Ed.2d 269 (1979). In this case, plaintiffs apparently concede that their interests are not such as would warrant a heightened degree

of scrutiny; in their briefs and at oral argument, they have addressed this issue in terms of "rational basis" review.[8] Nonetheless, they assert that the Regulations cannot survive the level of scrutiny required under that test, as properly interpreted. The question of the appropriate formulation and application of the rational basis test requires some explanation.

Cases involving the rational basis test have not always presented a consistent approach to either the standard or its application; formulations range from the extremes of deference illustrated in cases as far back as *Lindsley v. Natural Carbonic Gas Co.*,[9] and, more recently, *United States R.R. Retirement Board v. Fritz*,[10] to the relatively rigorous formulation first employed in *Royster Guano Co. v. Virginia*.[11] Recent caselaw provides good reason to doubt that the *Royster Guano* standard is an appropriate formulation of the rational basis test;[12] in the eyes of some, however, the rational basis test has in recent years "[taken] on a new, more pen-

**8.** In their Reply Memorandum, plaintiffs argue that "while a heightened level of review is called for here under the substantive due process analysis set forth in *Moore* ... the less rigorous rationality test ... will be sufficient [for equal protection purposes]". *See* Plaintiffs' Reply Memorandum at 10.

**9.** 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911) ("The Equal Protection Clause ... avoids what is done only when it is without any reasonable basis and is therefore purely arbitrary.... if any state of facts reasonably can be conceived that would sustain [the law], the existence of that state of facts at the time the law was enacted must be assumed").

**10.** 449 U.S. 166, 179, 101 S.Ct. 453, 461–62, 66 L.Ed.2d 368 (1980) ("Where, as here, there are plausible reasons for Congress' action, our inquiry is at an end. It is, of course, constitutionally irrelevant whether this reasoning in fact underlay the legislative decision") (citations omitted).

**11.** 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920) ("The classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation"). To an extent, these variations can be explained historically. With the demise of the "searching 'ordinary' rational-basis review ... [typical in] the days of *Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905)", *City of Cleburne*, 473 U.S. at 460, 105 S.Ct. at 3265 (Marshall, J., dissenting), courts were particularly hesitant to employ a standard which could quickly or easily lead to judicial invalidation of state legislative action. In time, this concern was addressed by the development of "rational basis" review for ordinary cases, and heightened standards of review applicable to particular suspect classifications. Nonetheless, the actual force and effect of the rational basis test have remained unclear. Protestations that this standard is "not a toothless one", *Mathews v. Lucas*, 427 U.S. 495, 510, 96 S.Ct. 2755, 2764, 49 L.Ed.2d 651 (1976) may have been indicative of judicial concern over the broadly deferential manner in which the rational basis test had been applied; as noted below, several recent cases employing the rational basis test have demonstrated a new willingness to engage in critical, in-depth analysis of asserted legislative purposes and means of achieving stated goals. Still, cases such as *United States R.R. Retirement Board v. Fritz*, 449 U.S. 166, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980) demonstrate that the rational basis test retains a highly deferential character. At least in part, the various manifestations of the rational basis test are reflective of deep divisions on the Supreme Court over the continued vitality of rigid levels of equal protection scrutiny. Compare Justice Stevens' concurrences in *Craig v. Boren*, 429 U.S. 190, 211, 97 S.Ct. 451, 464, 50 L.Ed.2d 397 (1976) ("There is only one Equal Protection Clause") and *City of Cleburne*, 473 U.S. at 453, 105 S.Ct. at 3261 ("We do not need to apply a special standard, or to apply "strict scrutiny," or even "heightened scrutiny," to decide such cases") with the views of Justice Marshall in *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 98, 93 S.Ct. 1278, 1330, 36 L.Ed.2d 16 (1973) ("The Court apparently seeks to establish today that equal protection cases fall into one of two neat categories.... A principled reading ... reveals that [the Court] has applied a spectrum of standards") and *City of Cleburne*, 473 U.S. at 460, 105 S.Ct. at 3265 ("[T]he level of scrutiny ... should vary with the 'constitutional and societal importance of the interest adversely affected'"). *See also Eisenbud v. Suffolk County*, 841 F.2d 42, 45 (2d Cir.1988) (noting various formulations of equal protection standards).

**12.** *See City of Mesquite v. Alladin's Castle, Inc.*, 455 U.S. 283, 294, 102 S.Ct. 1070, 1077, 71 L.Ed.2d 152 (1982) ("It is unclear whether this Court would apply the *Royster Guano* standard to the present case"); *Schweiker v. Wilson*, 450 U.S. 221, 244–45, 101 S.Ct. 1074, 1087–88, 67 L.Ed.2d 186 (1981) (Powell, J., dissenting) (suggesting that the *Royster Guano* standard should be applied "[w]hen no indication of legislative purpose appears other than the current position of the Secretary"); *Reed v. Reed*, 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971) (applying *Royster Guano* standard to gender-based classification).

etrating character". L. Tribe, *American Constitutional Law*, § 16–3, at 1444 (2d ed. 1988). Thus the Supreme Court has used the rational basis test to probe extensively into the relationship between asserted goals and means,[13] and has been particularly likely to strike down a statute when there is reason to believe that the underlying purpose is a particular animus or prejudice against some group,[14] or where "the lack of a rational relationship between the legislative classification and the purported legislative goal suggests that the true goal is illegitimate".[15] Nonetheless, in cases where a legislature specifically indicated a concededly legitimate purpose, and "[w]here there was evidence before the legislature reasonably supporting the classification," *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464, 101 S.Ct. 715, 724, 66 L.Ed.2d 659 (1981), the Court has not been quick to infer a different, impermissible purpose.[16] In such cases, so long as the legislature "could rationally have decided" that the means chosen would promote a permissible objective, the challenged statute has been upheld. *Id.* at 466, 101 S.Ct. at 725. Taken as a whole, the recent caselaw demonstrates that while the rational basis standard continues to be a fairly deferential one, nevertheless it has been used to invalidate statutes which reasonably appear to be motivated by invidious or prejudicial intent.[17]

---

**13.** *See, e.g., Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982). Whether *Plyler* should be considered a "rational basis" case is a question of some difficulty. See, e.g., *Id.* at 224, 102 S.Ct. at 2398 (The statute "can hardly be considered rational unless it furthers some substantial goal of the state"). *See also Lindsey v. Normet*, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972); *Reed v. Reed*, 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971) (Gender-based classification held not to "bear[ ] a rational relationship to a state objective").

**14.** A critical assumption informing equal protection jurisprudence is that while legislatures may at times act unwisely, perhaps basing their decisions on an erroneous understanding of underlying social conditions or designing programs which are less than successful at implementing the policies the legislature seeks to promote, the task of remedying such errors should properly remain with the legislature; "even improvident decisions will eventually be rectified by the democratic process". *City of Cleburne*, 473 U.S. at 440, 105 S.Ct. at 3254; *Personnel Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 272, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979). On the other hand, the presence of legislative classifications based on race, alienage, national origin or, in certain circumstances, gender, tend to negate any such assumptions about the self-correcting nature of the political process. *See United States v. Carolene Products*, 304 U.S. 144, 152, n. 4, 58 S.Ct. 778, 783, n. 4, 82 L.Ed. 1234 (1938). These "factors [are] so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy—a view that those in the burdened class are not as worthy or deserving as others." *City of Cleburne*, 473 U.S. at 440, 105 S.Ct. at 3254. While the distinction between circumstances in which the political process is assumed to function properly and those in which it is likely to fail has its most direct application in the development of heightened standards of equal protection review, the Supreme Court has on a number of occasions incorporated this distinction within the rational basis test itself. *See City of Cleburne*, 473 U.S. at 450, 105 S.Ct. at 3259 ("irrational prejudice against" mentally retarded); *United States Department of Agriculture v. Moreno*, 413 U.S. 528, 534, 93 S.Ct. 2821, 2825, 37 L.Ed.2d 782 (1973) (law intended to prevent "hippies" from participating in food stamp program). *See also Vance v. Bradley*, 440 U.S. 93, 106–08, 99 S.Ct. 939, 947–48, 59 L.Ed.2d 171 (1979) (After extensive analysis, Court finds legislative purpose behind mandatory retirement provisions of Foreign Service Act to be legitimate; classification upheld). Several such cases have involved attempts to favor long-time state residents over more recent arrivals, a factor not present here. *See Attorney General of New York v. Soto–Lopez*, 476 U.S. 898, 106 S.Ct. 2317, 90 L.Ed.2d 899 (1986); *Hooper v. Bernalillo Cty. Assessor*, 472 U.S. 612, 105 S.Ct. 2862, 86 L.Ed.2d 487 (1985); *Williams v. Vermont*, 472 U.S. 14, 105 S.Ct. 2465, 86 L.Ed.2d 11 (1985); *Zobel v. Williams*, 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982).

**15.** *Lyng v. International Union, UAW*, 485 U.S. 360, 108 S.Ct. 1184, 1195, 99 L.Ed.2d 380 (1988) (Marshall, J., dissenting) (citing *City of Cleburne*, 473 U.S. at 450, 105 S.Ct. at 3259, and *U.S. Dept. of Agriculture v. Moreno*, 413 U.S. 528 at 534, 93 S.Ct. 2821 at 2825, 37 L.Ed.2d 782 (1973).

**16.** *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. at 463 n. 7, 101 S.Ct. at 723 n. 7 (Court will assume that articulated purpose of legislature is actual purpose unless circumstances force the conclusion that it could not have been a goal of the legislation).

**17.** Compare Note, *Impermissible Purposes and the Equal Protection Clause*, 86 Colum.L.Rev.

A few additional comments regarding the articulation of legislative purpose are in order. On the one hand, the Supreme Court has said that the actual purpose behind a statute is "constitutionally irrelevant", *United States R.R. Retirement Board v. Fritz*, 449 U.S. at 179, 101 S.Ct. at 461. Other cases have intimated that the purpose of the statute must be "articulated", *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973), or "identified by the State", *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 314, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976). It has also been suggested that "[w]hen no indication of legislative purpose appears other than the current position of the Secretary", a more probing standard of review should be applied. *Schweiker v. Wilson*, 450 U.S. 221, 244–45, 101 S.Ct. 1074, 1087–88, 67 L.Ed.2d 186 (1981) (Powell, J., dissenting). Of course, courts are not in a position to require that statutes or regulations come equipped with statements of purpose. Where, as here, the Mitchell–Lama Law contains express statements of purpose but the Regulations do not, it is appropriate to presume that the purpose of the Regulations is in accord with that of the statute, unless there is some clear basis to find otherwise, and to determine the legitimacy of purpose accordingly.[18]

In this case, there is some dispute as to the purpose of the Mitchell–Lama Law and the Regulations. Plaintiffs argue that both the Mitchell–Lama Law and the general structure of the Regulations demonstrate that their primary purpose is to protect families from the assorted problems associated with unsafe and inadequate housing. Defendants assert that the Mitchell–Lama Law seeks, among other things, to make housing available to targeted preference populations, and that the Regulations attempt to "further the City's legitimate interest in minimizing the passage of apartments to those falling outside the statutory priority scheme". *See* Municipal Defendants' Memorandum of Law at 17.

The parties have not submitted any supporting material comparable to a legislative history demonstrating HPD's purposes in promulgating the Regulations, and the Regulations themselves do not contain an express statement of purpose.

Defendants' description may not fully indicate the extent to which the Regulations reflect a compromise between potentially conflicting legislative purposes; on balance, however, it appears to be a more accurate characterization of the purpose of both the Regulations and the Mitchell–Lama Law than the description suggested by the plaintiffs. The Mitchell–Lama Law seeks to remedy the housing problems of low-income families and persons, N.Y.Priv.

1184 (1986). Admittedly, there are cases in which the distinction between "purpose" and "means" may be blurred. *See, e.g. Lyng v. International Union, UAW*, 485 U.S. 360, 108 S.Ct. 1184, 99 L.Ed.2d 380 (1988) (Court finds that amendment prohibiting strikers from receiving food stamps was motivated by legislative desire to treat competing groups equally); *see also Vance v. Bradley*, 440 U.S. at 101, 99 S.Ct. at 944–45 (in suit challenging mandatory retirement provisions applicable to foreign service officers, Court noted that "the District Court mischaracterized the purpose of § 632.... Congress was intent not on rewarding youth *qua* youth, but on stimulating the highest performance in the ranks of the Foreign Service"). However, in each such case, the Supreme Court has upheld the challenged classification only after finding evidence supporting a purpose which it viewed as legitimate. Cases such as *Bowen v. Owens*, 476 U.S. 340, 106 S.Ct. 1881, 90 L.Ed.2d 316 (1986) (provisions of Social Security Act permitting survivors' benefits to remarried widows but not to divorced and remarried widows upheld; Congress could rationally have assumed that divorced widows are less dependent on former spouses than widows), and *Schweiker v. Wilson*, 450 U.S. 221, 236–37, 101 S.Ct. 1074, 1083–84, 67 L.Ed.2d 186 (1981) (linking institutionalized persons' eligibility for SSI benefits to the institution's eligibility for Medicaid upheld; Congress could rationally have chosen to incorporate Medicaid standards into SSI), are not to the contrary; in each of these cases, the dissent argued not that the purpose behind the legislation was impermissible, but that there was no discernable purpose at all.

**18.** In this discussion the Court assumes without deciding that under New York State administrative law, the Regulations are a permissible exercise of authority delegated by the Mitchell–Lama Law.

Hous.Fin.L. § 11 (McKinney 1976), determines that certain groups are to get priority in the allocation of available apartments, N.Y.Priv.Hous.Fin.L. § 31 (McKinney 1976), emphasizes that "neither the municipalities nor the state have adequate resources to undertake, develop and operate the comprehensive programs and projects needed ...", N.Y.Priv.Hous.Fin.L. § 11–a (McKinney 1976), and, in the case of housing companies subsidized by municipalities, delegates to supervising municipal agencies the power to promulgate and implement regulations to carry out the law's purposes, N.Y.Priv.Hous.Fin.L. §§ 23, 32 (McKinney 1976).

The primacy which plaintiffs would give to "families" in this context is unwarranted. While the statute does seek to protect "families", it nowhere defines the term. In addition, individuals are included in the class the statute seeks to protect, and regardless of whether families or individuals are involved, the statute particularly seeks to protect persons of low income. Furthermore, the statute specifically provides that priority is to be given to veterans or their surviving spouses and, in certain circumstances, to the elderly and disabled. In the event of a conflict between family members of moderate income and individuals of low income (who may qualify for priority as veterans, disabled persons or elderly persons), the statute suggests that priority be given to low-income individuals; however, when family members are already in residence, no specific mechanisms for re-solving such conflicts are mandated by the statute. The Court cannot agree that under this statute, "families" trump all others in the protected class, or that the definition of family necessarily includes grandchildren. Rather, the statute embodies a variety of purposes, all involving the provision of safe, adequate and affordable housing to people of low income, with multiple and at times conflicting priorities as to how such housing is to be allocated. There is no immediate reason to assume that the Regulations have a purpose which conflicts with those specified by the statute. Insofar as may be abstracted from the text of the Regulations themselves,[19] they establish occupancy priorities based on income as well as certain statutorily specified factors, they provide for enforcement of primary residency and income requirements on an ongoing basis, and they set strict limits on the transfer of occupancy rights, to ensure maximum availability of subsidized units on an equitable basis. So stated, there is nothing invidious or impermissibly discriminatory about the goals the statute and the Regulations seek to attain.[20]

▆▆▆ At this point the inquiry shifts to whether there is a rational relationship between the substance of the Regulations and their purpose. In the main, Supreme Court cases illustrate a high degree of deference in determining what may "rationally" be said to justify a statute.[21] It is true that other cases show a much greater willingness to challenge an asserted relation-

---

**19.** The Court recognizes the danger in inferring purpose from text; if not done carefully, the question of whether the means chosen are rationally related to the purpose may become a tautology. *See United States R.R. Retirement Bd. v. Fritz,* 449 U.S. at 186–87, 101 S.Ct. at 465–66 (Brennan, J., dissenting). However, courts have for years been accustomed to inferring the purpose of a statute from its language and overall structure. In this instance, the Court bases its conclusion primarily on an examination of provisions of the Regulations whose validity is not in dispute. Further, there is nothing in the Regulations which indicates any animus toward any individuals or groups.

**20.** Although the Regulations do require that tenant/cooperators and occupants of Mitchell–Lama housing be New York residents, they are in no way comparable to cases such as *Zobel,* 457 U.S. 55, 102 S.Ct. 2309, where the purpose of the statute was to favor long-term residents of a state over recent arrivals.

**21.** *See, e.g., McGowan v. Maryland,* 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961) ("A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it."); *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. at 466, 101 S.Ct. at 725 ("Whether *in fact* the Act will promote more environmentally desirable milk packaging is not the questions: the Equal Protection Clause is satisfied by our conclusion that the Minnesota Legislature *could rationally have decided* that its ban ... might foster greater use of environmentally desirable alternatives.") (emphasis in original).

ship between ends and means; *See, e.g. City of Cleburne,* 473 U.S. at 448–50, 105 S.Ct. at 3258–60; as noted above, however, in such cases it appears that the Court was motivated by a suspicion that the legislative purpose itself was impermissible. It is still the rule that

> a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis', it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality'.

*United States R.R. Retirement Bd. v. Fritz,* 449 U.S. at 175, 101 S.Ct. at 459, *quoting Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970).

The fact that a classification represents a compromise between different legislative purposes is of itself not objectionable; the classification will be upheld "unless the varying treatment of different groups is so unrelated to the achievement of any combination of legitimate purposes that [a court] can only conclude that the legislature's actions were irrational." *Parham v. Hughes,* 441 U.S. 347, 352, 99 S.Ct. 1742, 1746, 60 L.Ed.2d 269 (1979); *Vance v. Bradley,* 440

U.S. at 97, 99 S.Ct. at 942–43. It should also be emphasized that the test is not whether a classification generates a harsh result for an individual or group within a class, but rather the evenhandedness of treatment of the class itself; "when the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern." *Personnel Adm'r of Massachusetts v. Feeney,* 442 U.S. at 272, 99 S.Ct. at 2292.

■ The focal point of plaintiffs' complaint is Stephen's inability to become a co-owner of the apartment. The Regulations provide two different ways in which an immediate family member may establish such a right. First, if a tenant/cooperator's lease or occupancy agreement is terminated for reasons other than cause, immediate family members in occupancy of an apartment may, under certain circumstances, succeed to the lease or occupancy agreement.[22] Second, any immediate family member who has resided in an apartment for two years may become a co-owner.[23]

The Regulations require significantly greater scrutiny of the family member's financial eligibility for purposes of applying to succeed to an apartment than for applying to become a co-owner.[24] No one

---

**22.** If the lease or occupancy agreement is terminated for cause, no family member may succeed; if terminated for any other reason, (i) a spouse may succeed if the apartment was his or her primary residence at the time the agreement is terminated, and (ii) a parent or child who has attained his or her majority may succeed if they (a) have resided in the apartment for two years, (b) have filed income statements during that time, and (c) obtain written approval of the housing company and HPD (on the basis of the same criteria as are applied to new applicants).

**23.** The Regulations require that the family member have maintained the apartment as his or her primary residence for two years and have filed the required income statements during that time; in addition, both the shareholder and the family member must intend to continue to remain in joint occupancy. A housing company may limit the number of individuals who are co-owners of shares.

**24.** Article II, Section 16(b)(2)(i) provides that a housing company and HPD may reject an appli-

cation to succeed submitted by a family member (other than a spouse) "for the same reasons that [they] would reject the application of a person who applies to become a new tenant/cooperator, or when the acceptance of a proposed family member would violate the income eligibility ... of any other federal, state or city program applicable to such apartment." Article III provides that applicants whose income falls above a ceiling calculated in accordance with a certain formula are ineligible for apartments. Thus the regulations would appear to preclude immediate family members (other than spouses) from succeeding to an apartment if their income is greater than the allowable ceiling. By contrast, Article VI, Section 3 does not require such an individualized test. It does provide that in considering an application to become a joint owner, "the financial status of the proposed party shall not be a factor as long as the prime tenant/cooperator meets the minimum eligibility requirements at the time of the request;" it would appear, however, that this provision relates to *minimum* income standards, not *maximum* standards. In the absence

other than an immediate family member may succeed to or become a co-owner of an apartment.

In essence, the challenged portions of the Regulations define conditions under which certain family members are both subject to less rigorous income ceilings than new applicants and permitted to bypass the waiting lists. Plaintiffs do not challenge the existence of a procedure of this type, and thus the Court assumes that, generally speaking, it is not constitutionally infirm. What plaintiffs challenge is *where HPD has drawn the line:* leaving children inside the privileged circle, leaving grandchildren outside.

The Court believes that there is a readily apparent justification for such a distinction. Given a policy that permits some family members to exceed normal income limits and bypass the waiting list, it is clear that a line must be drawn somewhere; otherwise, families could dominate apartments in perpetuity, to the detriment of the statute's goals. Of course, *Moore* intimated that the Constitution protects the rights of uncles, aunts and cousins to share a household, as well as grandparents. Plaintiffs have not suggested—nor, in the opinion of the Court, could they—that the Equal Protection Clause requires that the Regulations' definition of "immediate family" include such collateral family members. If these family members can reasonably be excluded, it is difficult to see why grandchildren may not. Viewing collateral family members as a class, it cannot be said to be irrational to assume that the exclusion of grandchildren, much like the exclusion of aunts, uncles, nephews, nieces or cousins, will work minimal disruption of families, strike at relatively few people whose financial status qualifies them for the

apartments, and eliminate a potentially large number of claimants who, if given such preferential treatment, would otherwise prevent apartments from becoming available to serve people with qualifying incomes, many of whom have been waiting for years to get an apartment.

Plaintiffs argue, however, that when contrasted with other New York and Federal statutes, and with regulations promulgated by DHCR under the Mitchell–Lama Law, the Regulations' definition of the term "immediate family" stands alone in excluding grandchildren, and that for this reason the Regulations' definition should be considered irrational. Each of these provisions requires separate consideration.

(a) Other New York Laws: Initially, it should be noted that the Court is unaware of any caselaw supporting the proposition that for purposes of equal protection, the rationality of a classification in one statute is to be measured by a similar classification contained in another statute.[25] Even if such a comparison were justified, in the Court's view the statutes cited by plaintiff would not compel the result they seek. Plaintiffs rely particularly on New York's Rent Control Law of 1946, N.Y.Unconsol. Laws § 8581 (McKinney 1987), and New York City's Rent Stabilization Law, N.Y. Unconsol.Laws *following* § 8597, §§ 26–501 *et seq.* (McKinney 1987); and while they correctly point out that these statutes, like the Mitchell–Lama Law, seek to address the serious public emergency caused by inadequate housing, they ignore the fact that those laws are intended to regulate the private housing market, not to administer publicly funded subsidies. The Court cannot accept the notion that the Equal Protection Clause compels New York City to apply standards designed for housing

of a particular test, the eligibility of a potential co-owner is linked to the general income ceilings for tenant/cooperators in residence spelled out in Article III, Section 5, pursuant to which a person or family in occupancy may be subject to removal if their income exceeds 25% of the maximum income standards applied to admissions, but may be permitted to stay up to the point where their income exceeds 50% of the maximum; further, owners of stock in a cooperative may, with the approval of HPD, stay in the

apartment for an additional three years or, with the approval of the housing company and HPD, for a longer period.

**25.** Plaintiffs suggest that *In the Matter of Concourse Village,* Index No. 16516/88 (N.Y.Sup.Ct. Dec. 22, 1988) supports such a result. This case is discussed in text below; for present purposes, it should be noted that the court's decision was based on New York administrative law, not the Equal Protection Clause.

which serves the general population to subsidized housing projects specifically designed to serve low income persons; while the Rent Control and Rent Stabilization Laws balance the interests of tenants against those of landlords, treating each group as a class operating within a regulated housing market, the Mitchell–Lama Law must balance the interests of current tenants against potential tenants, with an eye to favoring those who cannot compete in the housing market. In this context, it would hardly be surprising—and could not be called irrational—if the legislature or administering agency chose to define "family" differently for purposes of the Mitchell–Lama Law than under Rent Control or Rent Stabilization.

The New York Court of Appeals' decision in *Braschi v. Stahl Associates Co.*, 74 N.Y.2d 201, 543 N.E.2d 49, 544 N.Y.S.2d 784 (1989), does not compel a conclusion to the contrary. In that case, the court was called on to interpret the term "family" as used in the New York City Rent and Eviction Regulations, 9 N.Y.C.R.R. 2204.6(d), in the absence of a statutory or regulatory definition. Applying traditional principles of statutory interpretation, and mindful of "both of the competing purposes of the rent control laws: the protection of individuals from sudden dislocation and the gradual transition to a free market system", 74 N.Y.2d at 212, 543 N.E.2d at 54, 544 N.Y. S.2d at 789, the court held that a gay life-partner of a tenant could, under certain circumstances, be deemed a member of the tenant's "family" for purposes of the rent control regulations. In so doing, the court noted that "the definition of family that we

adopt here for purposes of the non-eviction protection of the rent-control laws is completely unrelated to the concept of "functional family," as that term has developed under this court's decisions in the context of zoning ordinances." *Id.*, 74 N.Y.2d at 212 n. 3, 543 N.E.2d at 54, 544 N.Y.S.2d at 789. While the *Braschi* decision may have some relevance to the question whether the Regulations are a valid interpretation of the Mitchell–Lama Law—a question this Court does not reach—it clearly does not compel a finding that for equal protection purposes, the New York State legislature or HPD could not rationally adopt a different definition of "family".[26]

(b) DHCR's regulations: Plaintiffs note that DHCR, which regulates state-subsidized Mitchell–Lama apartments, includes grandchildren in their definition of "family"; they argue that it is irrational for HPD to choose a different definition. In support of their argument, plaintiffs cite a State Supreme Court case, *In the Matter of Concourse Village*, Index No. 16516/88 (N.Y.Sup.Ct. Dec. 22, 1988). In that case, petitioner Concourse Village brought an Article 78 proceeding challenging a determination by DHCR that a grandson was entitled to succeed to his grandparents' apartments. The court found that DHCR's decision was "rationally based", noting that the Mitchell–Lama Law did not provide specific regulations governing succession and that "no compelling reason has been presented as to why a grandson should be entitled to a lesser right under the [Mitchell–Lama Law] than under the Rent Stabilization Code".

**26.** Nor does the recent decision in *East 10th Street Associates v. Estate of Stuart Goldstein*, App.Div., 552 N.Y.S.2d 257 (1st Dept.), require such a result. In that case, the court held, in effect, that it would be arbitrary and capricious to exclude a gay life-partner from the definition of "family" under the Rent Stabilization Code, in view of the New York Court of Appeals' decision in *Braschi* and the close affinity of purpose of the Rent Stabilization Law with the Rent Control Law. At the time the *East 10th Street Associates* case was filed, DHCR's regulations governing rent stabilized housing would have excluded a gay life-partner from the definition of family; by the time the decision was handed down, DHCR had amended its regulations in accordance with the guidelines set down in *Braschi*. At best, *East 10th Street Associates* might imply that a "family" should be similarly defined under the Mitchell–Lama Law; in view of the Appellate Term's reliance on the lack of any significant differences between the Rent Control and Rent Stabilization systems, even this is uncertain. In any event, *East 10th Street Associates* does not suggest that for equal protection purposes, it would be irrational for HPD to adopt a different definition of the term "family", in light of the differences in purpose between the Mitchell–Lama Law and the Rent Stabilization Law.

It is clear that *Concourse Village* does not control here. That case held that DHCR's determination was rationally based; insofar as it appears, the issue was decided as a matter of New York administrative law. *Concourse Village* may support the proposition that the Mitchell–Lama Law itself requires grandchildren to be included within the definition of "immediate family", but that question is properly left for New York courts to decide. However, nothing in *Concourse Village* or DHCR's regulations compels the conclusion that the Equal Protection Clause requires HPD to conform its definition of "immediate family" to DHCR's. One purpose of the Mitchell–Lama Law is to encourage municipalities to stimulate the production of low-income housing; in furtherance of that purpose, the statute provides that such housing companies are subject to regulation by the municipality. There is nothing constitutionally suspect about an arrangement of this type; but if that is so, it must be conceded that it is rational to allow municipalities to adopt regulations which do not conform to those of DHCR. Presumably, the regulations adopted by each supervisory agency are crafted with an eye to conditions within the jurisdiction subject to regulation and the level of funding which the state or municipality, as the case may be, has available for purposes of subsidizing housing; at least, it would be constitutionally permissible for them to do so. The Court cannot agree that simply because DHCR chooses a different policy, HPD's policy is irrational.

(c) Federal Law: Although the issue was never raised in the pleadings, plaintiffs point out that the Mitchell–Lama Law requires housing corporations to accept federally funded Section 8 reimbursement in lieu of rent payments, and that under the Section 8 program, a grandchild is entitled to succeed to a grandparent's apartment. They conclude that "the HPD exclusion of grandchildren is contrary to the federal statutory program which it is bound to accommodate." In support of this argument, they point to *Sunrise Park Housing Development Fund Co. v. Matthews*, N.Y. L.J. Oct. 10, 1989, at 27. It would appear from that opinion that the housing project in question was subsidized under Section 236 of the National Housing Act, not Mitchell–Lama; further, the case made it clear that not all family members are entitled to succeed to a Section 8 tenancy: "[a] family member who assumes occupancy just before a tenant's death solely for the purpose of succeeding to the tenancy is not afforded protection." So far as the Court is aware, plaintiffs do not participate in the Section 8 program; while in a properly presented case there might be grounds to hold that *with regard to Section 8 tenants*, federal law pre-empts HPD's regulations, on this record the Court cannot conclude that any such preemption would or should extend to tenants not participating in the Section 8 program.

In summary, the Court concludes that the Mitchell–Lama Law and the Regulations have multiple purposes, including encouraging municipal entities to stimulate the development of affordable housing, providing such housing to low income families and individuals, and giving preference to certain classes of people; that these purposes are fully legitimate; that the means chosen by HPD to fulfill these purposes include the creation of a comprehensive regulatory scheme setting multifaceted admission criteria, income limitations, waiting lists, and limits on the ability to succeed to an apartment; and that these regulations are rationally related to the purposes of the statute. Nothing in any other provision of law or regulation leads the Court to question the rationality of the Regulations. As a result, plaintiffs' equal protection claims must fail.

■ 3. *Takings:* Plaintiffs' takings claims cannot be sustained. In view of this Court's holding that the Regulations do not violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment, it is clear that no fundamental rights are at issue, and that Stephen does not have a constitutional right to remain in the apartment independent of David's and Fanny's occupancy. And, while David and Fanny clearly have a property interest in their shares and the apartment, any asser-

tion that they have been deprived of that interest is premature. The HPD hearing which plaintiffs seek to enjoin would, at most, result in a determination that the apartment was no longer their primary residence, and that a certificate of eviction should issue. The determination of HPD's hearing officer would be reviewable in an Article 78 proceeding; further, before they could be removed from the apartment, it would still be necessary for Cadman Towers to institute and prevail in an eviction proceeding in New York City Housing Court. Plaintiffs argue that the outcome of the HPD hearing is a foregone conclusion, since David and Fanny have not resided in the apartment since November of 1987. In effect, plaintiffs ask the Court to assume what is yet to be decided: that the HPD hearing will result in a deprivation of their property. Under the Regulations, the hearing officer must take into account a variety of factors indicative of intent to continue to reside in the apartment, and it is not at all clear that, upon such consideration, the officer will necessarily determine the issue adversely to plaintiffs. Nor, in view of the Regulations' provisions for resale of shares to Cadman Towers, is it clear that plaintiffs could argue that any taking

was uncompensated. Under these circumstances, plaintiffs' takings claim is simply not ripe for adjudication.[27]

4. *Section 1983:* For reasons similar to those stated above, Plaintiffs' § 1983 claims cannot be sustained. Since the Regulations do not infringe any of plaintiffs' fundamental rights, and since it is not yet determinable whether the HPD hearing will lead to an uncompensated taking, plaintiffs cannot make out a cause of action under § 1983.[28]

5. *State Law Claims:* In their complaint, plaintiffs allege causes of action grounded in Article 78 of the New York Civil Practice Law & Rules, N.Y.Civ. Prac.Law § 7801 *et seq.* (McKinney 1981). In addition, although the issue was not raised in the pleadings, plaintiffs argue in their reply memorandum that the Regulations violate the equal protection provisions of the New York State Constitution. The only basis of jurisdiction alleged by plaintiffs for these claims is pendent jurisdiction.

Under *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), a court must resolve

**27.** *See Williamson Co. Regional Planning v. Hamilton Bank*, 473 U.S. 172, 195, 105 S.Ct. 3108, 3121, 87 L.Ed.2d 126 (1985) ("[If] a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation."). *See also Hodel v. Virginia Surface Min. & Reclam. Ass'n*, 452 U.S. 264, 295, 101 S.Ct. 2352, 2370, 69 L.Ed.2d 1 (1981) ("Because appellees' taking claim arose in the context of a facial challenge, it presented no concrete controversy....").

**28.** Defendants also argue that because plaintiffs have the option of challenging the HPD hearing results in an Article 78 proceeding, there is no deprivation of property "without due process", citing as support *Parratt v. Taylor*, 451 U.S. 527, 536, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981) and *Eastway Construction Corp. v. City of New York*, 762 F.2d 243 (2d Cir.1985). The Second Circuit has held, in cases involving procedural due process claims, that the availability of a post-deprivation Article 78 proceeding satisfied the requirements of due process. *See, e.g. Campo v. New York City Employees' Retirement Sys.*, 843 F.2d 96, 102–03 (2d Cir.1988) (citing cases). However, in both *Hudson v. Palmer*, 468 U.S. 517, 532, 104 S.Ct. 3194, 3203, 82 L.Ed.2d 393

(1984), and *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 435–36, 102 S.Ct. 1148, 1157–58, 71 L.Ed.2d 265 (1982), the Supreme Court noted that *Parratt* was applicable to deprivations resulting from "random and unauthorized conduct", not from "established state procedure". *Id.* More recently, in *Zinermon v. Burch*, —— U.S. ——, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990), the Court explained that in cases where state officials are given "broadly delegated, uncircumscribed power", at ——, 110 S.Ct. at 989, their actions cannot be considered "random and unauthorized"; further, *Zinermon* squarely took the position—albeit in *dictum*—that *Parratt* does not apply in cases where plaintiffs allege violations of substantive due process rights. On the facts of this case, *Parratt* is inapplicable. In no sense can the actions of HPD in promulgating the Regulations or of Cadman Towers and HPD personnel in enforcing the Regulations be considered "random and unauthorized"; further, under *Zinermon*, *Parratt* would not apply to plaintiffs' substantive due process and equal protection claims in any case. While plaintiffs' takings claim might be controlled by *Parratt*, any such determination at this stage would be premature.

two questions before taking jurisdiction over state law claims for which there is no independent basis of jurisdiction. First, it must be determined whether the court has the power to hear the state-law claim; second, if the power exists, it must be determined whether the case is one in which the court, in its discretion, should exercise jurisdiction. *Id.* at 725–27, 86 S.Ct. at 1138–40.

Whether a federal court has the power to hear a state claim turns on whether "the relationship between [the federal] claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case'". *Id.* at 725, 86 S.Ct. at 1138. *Gibbs* identified three elements relevant to this determination: (i) the federal claim must have "sufficient substance" to confer subject matter jurisdiction on the court, (ii) the state and federal claims must arise out of a "common nucleus of operative fact", and (iii) the claims must be such that one would normally expect to try them together, in the sense that failure to do so might result in the state law claims being barred by principles of *res judicata. Id.*

In addition, *Gibbs* makes it clear that "pendent jurisdiction is a doctrine of discretion"; "its justification lies in considerations of judicial economy, convenience and fairness to litigants". *Id.* at 726, 86 S.Ct. at 1139. Factors relevant to the exercise of discretion include, among others,[29] comity, the desire to promote a "surer-footed reading of applicable law", whether state issues substantially predominate, or whether the state claim is closely tied to questions of federal policy. "Once it appears that a state claim constitutes the real body of a case, to which the federal claim is only an appendage, the state claim may fairly be dismissed." *Id.* at 726–27, 86 S.Ct. at 1139–40.

 In this instance, while plaintiffs' federal claims are substantial and there exists a common nucleus of operative fact

between state and federal claims, it is not clear that the state claims need be or would ordinarily be tried together. If plaintiffs chose to bring their action in state court, they would normally have done so by initiating an Article 78 proceeding after the HPD hearing had taken place, not before. Further, plaintiffs' state-law claims are by no means precluded by today's determination with regard to the federal constitutional law issues, since the Court has merely assumed, but not decided, that the Regulations do not violate the Mitchell–Lama Law. In addition, the Court's holding does not amount to a determination of the scope of the equal protection provisions of the New York State Constitution.

Even if there were no question regarding the Court's power to hear plaintiffs' state law claims, there are substantial reasons why it would be inappropriate to do so. First, New York State has a well-established procedure for judicial review of administrative action; comity alone would counsel the Court not to interfere with that process. Second, New York follows customary principles of exhaustion of remedies; plaintiffs could not bring an Article 78 proceeding in state court unless and until they had gone through the HPD hearing they ask the Court to enjoin. *See, e.g. Kostick v. Del Castillo,* 133 A.D.2d 759, 520 N.Y.S.2d 48 (2d Dept.1987). Thus, in order to fairly decide the questions of New York statutory and administrative law presented here, the Court would need to stay proceedings until the HPD hearing was concluded. At that point, it could readily be said that the only issues in the case would be ones of state law. Third, the question of whether the equal protection provisions of the New York Constitution require greater scrutiny than is required under the Federal Constitution is particularly difficult; in the absence of authoritative guidance from New York courts, a federal court would be ill-advised to decide such a question.[30] In sum, the Court be-

---

**29.** Certain of the factors listed in *Gibbs,* such as whether all federal claims are dismissed prior to trial, have no application to this action for injunctive relief.

**30.** The cases cited by plaintiffs cannot be said to resolve this issue. In *McMinn v. Town of Oyster Bay,* 66 N.Y.2d 544, 488 N.E.2d 1240, 498 N.Y. S.2d 128 (1985), a zoning ordinance case, defen-

lieves that it is appropriate to decline to exercise jurisdiction over plaintiffs' state-law claims.

On the basis of the foregoing, Defendants' motion to dismiss is granted as to all claims.

SO ORDERED.

dants argued that the ordinance would pass muster under the Supreme Court's ruling in *Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974), and thus should survive under New York equal protection analysis as well. The Court of Appeals found that the ordinance was more restrictive than the one approved in *Belle Terre,* and noted that "[w]e have no need to consider [whether the ordinance would withstand Federal constitutional analysis], for it is clear that the definition of family contained in this ordinance is incompatible with our prior decisions". 66 N.Y.2d at 551, 488 N.E.2d at 1244, 498 N.Y.S.2d at 132. The Court of Appeals took a similar position in *Baer v. Town of Brookhaven,* 73 N.Y.2d 942, 537 N.E.2d 619, 540 N.Y.S.2d 234 (1989). And, while the New York cases some-times define the rationality standard in the same terms found in *Royster Guano, see, e.g., Weissman v. Evans,* 56 N.Y.2d 458, 438 N.E.2d 397, 452 N.Y.S.2d 864 (1982), they find support for this in federal cases. *See Id.,* 56 N.Y.2d at 465, 438 N.E.2d at 400, 452 N.Y.S.2d at 867 (citing *Manes v. Goldin,* 400 F.Supp. 23, 29 (S.D. N.Y.1975), *aff'd,* 423 U.S. 1068, 96 S.Ct. 851, 47 L.Ed.2d 80 (1976)). In addition, other New York cases employ a standard which could be taken to be significantly more lenient than that of *Royster Guano. See, e.g., Burrows v. Board of Assessors,* 64 N.Y.2d 33, 36, 473 N.E.2d 748, 749, 484 N.Y.S.2d 520, 521 (1984) (discriminatory tax classification will pass constitutional muster if any conceivable state of facts will support the classification).