MEMORANDUM OPINION AND ORDER
BABCOCK, District Judge.
In this Radiation Exposure Compensation Act (RECA), 42 U.S.C. § 2210 note, section 5, (Supp.1994) action, plaintiffs Norma Howell (Howell), widow of Robert Bert Howell, deceased, and Alfred Eldon Ball (Ball) seek review of defendants’, Janet Reno, U.S. Attorney General, and the United States Department of Justice (DOJ) (collectively, defendants) denial of compensation under RECA. Plaintiffs also challenge certain statutory provisions of RECA as violative of their right to equal protection under the law pursuant to the Fifth Amendment of the United States Constitution. I have reviewed plaintiffs’ administrative records and considered the parties’ briefs and oral argument. For the following reasons, I affirm the decisions of the Department of Justice.
I.
A. Howell claim
Plaintiff Norma Howell is the widow of decedent Robert Bert Howell who was bom in 1920. Mr. Howell worked for Union Carbide as an underground uranium miner from 1959 to 1971. Administrative Record (Howell AR) p. A-3; D-49-52. Mr. Howell developed pulmonary fibrosis and, allegedly, lung cancer after age 45. Howell AR p. C-29, 33. Mr. Howell filed his RECA claim on October 27, 1993. He died on April 15, 1994 from cancer. According to defendants, Mr. Howell smoked up to a pack of cigarettes a day for several decades. For purposes of this appeal, plaintiff agrees that Mr. Howell was a cigarette smoker as contemplated by RECA. Pltf.Brf. p. 4. The DOJ denied Mr. Howell’s RECA claim on February 25, 1994 for failing to meet the required levels of radiation exposure. Howell AR C-14-16. Howell’s widow filed an administrative appeal of the denial alleging the unconstitutionality of RECA. Howell AR B-8. On August 29, 1994, the DOJ issued a final order denying Mr. Howell's claim. Howell AR B-9-12. On February 28, 1995, Mrs. Howell filed this action.
B. Ball claim
Ball was born in 1924. He worked in ■underground uranium mines during parts of 1953, 1954, and 1957. Ball Administrative Record (Ball AR) p. 3. Ball was diagnosed with pulmonary fibrosis after he was 45 years old. Id. On June 15,1994, Ball filed a RECA claim. In support of his claim, Ball indicated that he was a non-smoker. In a letter dated July 28, 1994, the DOJ advised Ball that it had determined that he was a smoker. Ball then submitted an affidavit attesting to the fact that, during his lifetime, he smoked one pack or less per day from December, 1941, to January, 1946. Ball AR p. 13. Ball also submitted a letter from Gerald E. Howe, M.D., confirming his smoking history. The letter also contains Dr. Howe’s opinion that Ball's risk factors for lung disease did not include his past tobacco use, but rather his “intense exposure to dust particles while performing his duties as an uranium miner.” Ball AR p. 181. Finally, Ball submitted a letter from Victor Archer, M.D. which states, in pertinent part:
Smoking ... has not definitely been shown to enhance the fibrogenie potential of ionizing radiation in either man or animals. *804 There are some animal studies which suggest an interaction, and others which reported no interaction. However, even if radiation does enhance fibrosis, it is unlikely that it could exert such an effect remote in time. That is, it seems reasonable that both exposures would have to take place at nearly the same time.
If a man had stopped smoking 7 years prior to his radiation exposure, it is unlikely that the smoking would have any influence on the radiation induced fibrosis. In pathology studies, cigarette smoking has been found to induce some pulmonary fibrosis in man, but it is of such a nature that it is rarely seen in human chest films. Most chest physicians believe that smoking alone does not cause sufficient fibrosis to be identified on chest X-rays.
Ball AR p. 182.
On April 7, 1995, the DOJ denied Balls claim after Ball’s working level month (WLM) exposure was recalculated as 473.15 WLMs, 26.85 WLMs less than the 500 WLMs required by RECA. On June 8,1995, Ball filed an administrative appeal of the agency denial which was affirmed on June 30, 1995. Ball filed civil action number 95-AP-1883 in this court on July 26, 1995 challenging the DOJ’s denial of his claim. Pursuant to plaintiffs’ motion, on November 15, 1995, Ball’s case was consolidated with Howell v. Reno, civil action number 95-B-481.
II.

Overview of RECA Statutory and Regulatory Scheme

Congress passed RECA to recognize and compensate for the injuries suffered by victims of this country’s nuclear research and weapons programs. 42 U.S.C. § 2210; section 2(a)(2). RECA authorizes a $100,000 payment to eligible, uranium miners or their survivors who establish that the miner contracted specific respiratory diseases after working in certain underground uranium mines. 42 U.S.C. § 2210 note § 5.
RECA includes the following pertinent findings:
radiation released in underground uranium mines that were providing uranium for the primary use and benefit of the nuclear weapons program of the United States Government exposed miners to large doses of radiation and other airborne hazards in the mine environment that together are presumed to have produced an increased incidence of lung cancer and respiratory diseases among these miners;
the United States should recognize and assume responsibility for the harm done to these individuals; and
the Congress recognizes that the lives and health of uranium miners ... were subjected to increased risk of injury and disease to serve the national security interests of the United States.
42 U.S.C. § 2210, section 2(a)(3-5).
The stated purpose of RECA is “to establish a procedure to make partial restitution to the [exposed] individuals ... for the burdens they have borne for the Nation as a whole.” Id. at section 2(b).
Eligibility for the RECA payment is determined in the following manner:
[a]ny individual who was employed in a uranium mine located in Colorado, New Mexico, Arizona, Wyoming, or Utah at any time during the period beginning on January 1, 1947, and ending on December 31, 1971, and who, in the course of such employment — •
(1)(A) if a nonsmoker, was exposed to 200 or more working level months of radiation [WLMs] and submits written medical documentation that he or she, after such exposure, developed lung cancer; or
(B) if a smoker, was exposed to 300 or more [WLMs] and cancer incidence occurred before age 45 or was exposed to 500 [WLMs], regardless of age of cancer incidence, and submits written medical documentation that he or she, after such exposure, developed lung cancer; or
(2)(A) if a nonsmoker, was exposed to 200 or more [WLMs] and submits written medical documentation that he or she, after such exposure, developed a nonmalignant respiratory disease; or
*805 (B) if a smoker, was exposed to 300 or more [WLMs] and the nonmalignant respiratory disease developed before age 45 or was exposed to 500 or more [WLMs], regardless of age of disease incidence, and submits written medical documentation he or she, after such exposure, developed a nonmalignant respiratory disease, shall receive $100,000 if—
(i) the claim for such payment is filed with the Attorney General by or on behalf of such individual, and
(ii) the Attorney General determines, in accordance with section 6, that the claim meets the requirements of this Act.
42 U.S.C. § 2210, Sec. 5.
For purposes of § 2210, “working level month of radiation” (WLM) means radiation exposure at the level of one working level every work day for a month, or an equivalent exposure over a greater or lesser amount of time. 42 U.S.C. § 2210, section 5(b)(1). The term “working level” is defined as a specific level of concentration of radon daughters in a liter of air. Id. at § 5(b)(2). RECA does not define the terms “smoker” or “nonsmoker.” However, the DOJ issued regulations which define “smoker” as “an individual who has smoked at least one (1) pack year of cigarette products.” 28 C.F.R. 79.31(f). A “pack year” is defined as 365 packs of cigarettes, the number of packs smoked by one who smokes one pack per day for one year. Id. at § 79.21(d). A “nonsmoker” is defined as “an individual who never smoked tobacco cigarette products or smoked less than the amount defined in paragraph (f).” Id. at 79.31(e).
RECA claims are processed by the DOJ, the ageney tasked with administering RECA. 42 U.S.C. § 2210, section 6(b)(1). Specifically, the Act is administered by the Radiation Exposure Compensation Unit (Unit) of the DOJ’s Tort Branch of the Civil Division. 28 C.F.R. §§ 79.2(k); 79.50(a). Under the regulations, a uranium miner or beneficiary who seeks compensation under RECA must file a claim with the Unit. Id. at § 79.51(a)-(b). After reviewing a claim and the supporting documentation, the Assistant Director issues a written decision granting or denying the claim. Id. at §§ 79.50(a); 79.52. The claim will be approved if it is shown by a preponderance of the evidence that the claimant was exposed to the requisite amount of radiation. Id. at § 79.32(c). A claimant who is denied compensation can appeal to a designated Appeals Officer within 60 days of the decision. Id. at §§ 79.50(b); 75.53(d). The Appeals Officer’s decision is the DOJ’s final ageney action on the claim. Id. at § 79.53(d).
III.
Plaintiffs challenge the DOJ’s calculation of WLM exposure stating that the calculation has a margin of error which, if included, would render plaintiffs eligible for compensation. Plaintiffs also contend that RECA’s differential treatment of miners with nonmalignant respiratory disease who were smokers is “wholly irrational” and denies equal protection of the law in violation of the Fifth Amendment of the United States Constitution. Plaintiffs’ Brief p. 3.
A. Standard of Review
Howell and Ball seek judicial review of a final agency action which is governed by the Administrative Procedure Act, 5 U.S.C. § 706 (APA) which provides in pertinent part:
To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an ageney action. The reviewing court shall—
(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.
“The duty of a court reviewing agency action under the ‘arbitrary or capricious’ standard is to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made.” Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1574 (10th Cir.1994). Agency action that contravenes con *806 stitutional constraint is, as a matter of law, arbitrary and capricious.
B. Challenge to the Method of Calculating a Claimant’s Working Level Months
Plaintiffs first contend that the method for determining the WLMs’s necessary to allow RECA compensation is arbitrary and capricious. I disagree.
The DOJ consults with a variety of sources to calculate how much radiation a claimant was exposed to while mining underground uranium between 1947 and 1971. Then, the Unit inspects records of the Public Health Service (PHS) and the Atomie Energy Commission (AEC) as well as designated federally-supported health-related studies. Id. at §§ 79.33(a)(l)-(4); 79.34(a). These records, which contain employment histories and WLMs for many uranium miners, are presumed to be correct, unless the claimant successfully impugns their accuracy. Id. at § 79.33(a).
If these records do not establish the claimant’s WLMs’s, he may submit other sources to establish additional periods of underground uranium mining employment and, hence, additional WLMs. Id. at § 79.34(b)-(c). These sources include Social Security records, id. at § 79.33(b)(l)(iii), state records, id. at § 79.33(b)(l)(i), and other specified sources. Id. at § 79.33(b)(1). If the other sources document additional WLMs for the claimant, they are added to the claimant’s total WLMs. Id. at § 79.34(b).
If the supplemental sources do not contain the claimant’s WLMs, they often contain the annual radiation level for the particular mine and year in which the claimant worked. See id. at § 79.34(d). These exposure levels are typically expressed in Working Levels of Radiation (WL). In such cases, the claimant’s WLMs are calculated by multiplying the mine’s annual WLs by the number of months the claimant worked at the mine. Id. at § 79.34(h)(2).
In other cases, the supplemental sources contain some annual WLs for a particular mine but not for a year in which the claimant worked at the mine. See id. at § 79.34(g)(2). The Unit then employs the following methodology:
If one or more .annual average measurements [expressed in WLs] exist for a mine, but are not more than five (5) years from the year the claimant was employed, the annual average closest in time will be assigned either forward or backward in time for two years.
Id. at § 79.34(g)(2)(B). The mine’s estimated annual WLs are then multiplied by the number of months the claimant worked at the mine, which yields the claimant’s WLMs from that mine during that year.
To find an agency action arbitrary or capricious under the APA, I must first consider whether the DOJ decision was based on a consideration of relevant factors and whether there has been a clear error of judgment. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); Delta Rocky Mountain Petroleum, Inc. v. United States Dept. of Defense, 726 F.Supp. 278, 279 (D.Colo.1989). The scope of my review is narrow and I cannot substitute my judgment for that of the DOJ. Overton Park, 401 U.S. at 416, 91 S.Ct. at 823-24. An agency’s decision is entitled to a presumption of regularity. Id. at 415, 91 S.Ct. at 823.
Congress, not the DOJ, set the WLM numbers establishing eligibility for the $100,-000 compensation payment. Also, virtually any calculation of WLM exposure necessarily includes a margin of error. However, the statutory and regulatory scheme used to calculate a claimant’s WLMs is comprehensive and broad. The regulations also provide alternative sources and methods for a claimant to get credit for all possible WLMs to which he or she is entitled. Also, the methodology used by the DOJ to calculate WLMs is based on multiple sources of data supported by research.
The DOJ decisions denying Howell and Ball their RECA compensation claims were based on consideration of the standards articulated in the statute. Further, nothing before me indicates that the DOJ ignored the WLM statutory requirements or eligibility information submitted by plaintiffs. Accordingly, I conclude that the method of calculating WLMs upon which the DOJ based its *807 decisions denying plaintiffs the RECA payment was not arbitrary and capricious or a clear error of judgment.
C. Scientific basis for the DOJ’s “smoker” classification
It is also argued that the DOJ, in categorizing Ball as a “smoker,” disregarded scientific evidence that smoking does not effect the development of nonmalignant pulmonary disease. Again, I disagree.
The Supreme Court strictly limits the circumstances under which courts may overturn regulations drafted by administrative agencies or order agencies to consider new evidence. Twenty years ago the Court directed:
[a]t least in the absence of substantial justification for doing otherwise, a reviewing court may not, after determining that additional evidence is requisite for adequate review, proceed by dictating to the agency the methods, procedures, and time dimension of the needed inquiry and ordering the results to be reported to the court without opportunity for further consideration on the basis of the new evidence by the agency. Such a procedure clearly runs the risk of “propeiping] the court into the domain which Congress has set aside exclusively for the administrative agency.”
Federal Power Commission v. Transcontinental Gas Pipe Line Corp., 423 U.S. 326, 333, 96 S.Ct. 679, 583, 46 L.Ed.2d 533 (1976), (quoting Securities and Exchange Commission v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947)). Moreover, the Supreme Court has repeatedly reprimanded courts for “depart[ing] from the very basic tenet of administrative law that agencies should be free to fashion their own rules of procedure.” Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 544, 98 S.Ct. 1197, 1212, 55 L.Ed.2d 460 (1978). A court may depart from this tenet only where there are “constitutional constraints or compelling circumstances” justifying such a departure. Id. at 543, 98 S.Ct. at 1211. Thus, only in the rarest of eases may a court invalidate rules drafted by an agency under authority from Congress.
The primary thrust of the argument here is that RECA’s differential treatment of cigarette smokers from those suffering non-malignant respiratory disease violates equal protection under the Fifth Amendment. Specifically, they argue that the “smoker”“nonsmoker” distinction contained in RECA § 5(a)(2)(B) lacks a rational relation to a legitimate governmental purpose.
At the outset, I note that the Fifth Amendment does not contain an explicit “equal protection” clause comparable to the Fourteenth Amendment. However, an equal protection argument is valid under the Fifth Amendment if the discrimination is “so unjustifiable as to be violative of due process.” Shapiro v. Thompson, 394 U.S. 618, 642, 89 S.Ct. 1322, 1335, 22 L.Ed.2d 600 (1969), overruled in part on other grounds, Edelman v. Jordan, 415 U.S. 651, 671, 94 S.Ct. 1347, 1359-60, 39 L.Ed.2d 662 (1974). Thus, the due process clause of the Fifth Amendment encompasses implied equal protection of the law. See United States Dept. of Agriculture v. Moreno, 413 U.S. 528, 533 n. 5, 93 S.Ct. 2821, 2825 n. 5, 37 L.Ed.2d 782 (1973). Equal protection standards are identical under both the Fifth Amendment and the Fourteenth Amendment. See Schlesinger v. Ballard, 419 U.S. 498, 500 n. 3, 95 S.Ct. 572, 574 n. 3, 42 L.Ed.2d 610 (1975); Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).
The principle of equal protection does not forbid classifications. It simply keeps “governmental decisionmakers from treating differently, persons who are in all relevant respects alike.” F.S. Royster Guano Co. v. Commonwealth of Virginia, 253 U.S. 412, 415, 40 S.Ct. 560, 561-62, 64 L.Ed. 989 (1920). Moreover, “legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality.” McGowan v. Maryland, 366 U.S. 420, 425-26, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961). Accordingly, Supreme Court precedent makes it clear that, “unless a classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only the elassifi- *808 cation rationally further a legitimate [governmental] interest.” Nordlinger v. Hahn, 505 U.S. 1, 9, 112 S.Ct. 2326, 2331, 120 L.Ed.2d 1 (1992).
Each party contends, and I agree, that the appropriate standard of review is whether the difference in treatment between “smoker” and “nonsmoker” rationally furthers a legitimate governmental interest. A plaintiff bears a heavy burden under this standard.
In general, under the “rational test” review, equal protection considerations are satisfied if there is: 1) a “plausible policy reason” for the classification; see United States R.R. Retirement Bd. v. Fritz, 449 U.S. 166, 174, 179, 101 S.Ct. 453, 459, 461-62, 66 L.Ed.2d 368 (1980); 2) the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker; see Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 464, 101 S.Ct. 715, 723-24, 66 L.Ed.2d 659 (1981); and 3) the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational. See City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 446, 105 S.Ct. 3249, 3257-58, 87 L.Ed.2d 313 (1985); Nordlinger, 505 U.S. at 10, 112 S.Ct. at 2331-32. Indeed, equal protection does not require that a legislature or governing decisionmaker actually articulate at any time the purpose or rationale supporting its classification. Id. at 15, 112 S.Ct. at 2334; Fritz, 449 U.S. at 179, 101 S.Ct. at 461. Nevertheless, it is required that a purpose may conceivably or “reasonably have been the purpose and policy” of the legislature. Allied Stores of Ohio, Inc. v. Bowers, 358 U.S. 522, 528-29, 79 S.Ct. 437, 441-42, 3 L.Ed.2d 480 (1959). The “rational basis” test places the burden on a plaintiff “to negative every conceivable basis” which might support the legislation in question. Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 364, 93 S.Ct. 1001, 1006, 35 L.Ed.2d 351 (1973). Legislation necessarily requires “line drawing” and classification. As a result, courts will not second guess such classification unless there is “invidious discrimination.” FCC v. Beach Communications, Inc., 508 U.S. 307, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993).
The primary purpose of RECA is to compensate miners whose respiratory disease was caused by work-related radiation exposure. Congress furthered this purpose by crafting the RECA statute to “insure that lung cancers and respiratory diseases for which compensation is provided are those ... most likely to have been caused by the radiation in the mines.” 136 Cong.Rec. S11748-04. .Also, Congress established the statute’s parameters to “take into account whether or not an individual’s own conduct may have caused or aggravated his or her health condition.” Id. at H3145.
Here, there is no question about the legitimacy of RECA’s aims. Rather, the challenge is to the means employed by Congress and its delegate, the DOJ, to achieve RECA’s goals. Under RECA, smoker-miners seeking compensation are required to demonstrate at least 300 WLMs if diagnosed with nonmalignant respiratory disease before age 45, and at least 500 WLMs if diagnosed after age 45. By contrast, nonsmoker-miners who develop nonmalignant respiratory disease, are eligible for compensation if they demonstrate at least 200 WLMs. The contention is that the higher WLM requirement for smokers lacks a rational basis because it is “not supported by reliable medical or scientific evidence_” Complaint at ¶ 11.
I conclude that a rational basis exists for the proposition that cigarette smoking contributes to respiratory disease. Indeed, it may be more accurate to say that no rational basis exists for the opposite proposition. See e.g., Cipollone v. Liggett Group, Inc., 893 F.2d 541, 576 (3rd Cir.1990) (statistical correlation between heavy smoking and lung cancer is well-documented). The United States Surgeon General has concluded that “the case for cigarette smoking as the principal cause of lung cancer is overwhelming.” Id. at 576-77 n. 43. Indeed, in recognition of this overwhelming evidence, in 1984 Congress mandated warnings on cigarette packages, one of which states “SURGEON GENERAL WARNING: Smoking Causes Lung Cancer-” 15 U.S.C. § 1333(a)(1) (Supp.II 1984) (emphasis in original).
*809 Abundant testimony and scientific studies were presented to Congress to support the higher WLM requirements for smokers. Much of the material indicated that cigarette smoking rather than radiation might in many cases cause respiratory disease among smoker-miners. Congress also heard testimony that cigarette smoking contributed to both lung cancer and non-malignant respiratory diseases among uranium miners. See, e.g., Hearing on H.R. 5022, Radiation Exposure Compensation Act Before the Subcommittee on Administrative Law and Governmental Relations of the Committee on the Judiciary, House of Representatives, 100th Cong., 2nd Sess. 41 (1988) (less than 3% of the U.S. cancer burden can be ... attributed to ionizing radiation ... compared to around 30% for tobacco smoking); Examining the Health Effects of Radiation Exposure Caused by Open Air Atomic Testing and Uranium Mining: Hearing before the Comm, on Labor and Human Resources, United States Senate, 101st Cong., 2nd Sess. 35 (1990) (we also know that there are other contributors to [non-malignant respiratory diseases], such as silica dust, cigarette smoking, chronic infections); Lung Cancer Mortality Among Nonsmoking Uranium Miners Exposed to Radon Daughters, id. at 61 (mortality from [nonmalignant respiratory diseases] is associated with smoking); Respiratory Disease: Mortality Among Uranium Miners, id. at 86 (exposure response curves for nonsmokers are linear for both respiratory cancer and other respiratory disease. Cigarette] smoking elevates and distorts that curve). Studies presented to Congress distinguish between uranium miners who smoke and those who did not. See, e.g., Lung Cancer Mortality Among Nonsmoking Uranium Miners Exposed to Radon Daughters, Examining the Health Effects of Radiation Exposure Caused by Open Air Atomic Testing and Uranium Mining: Hearing before the Comm, on Labor and Human Resources, United States Senate, 101st Cong., 2nd sess. 61 (1990) (noting difficulty in interpreting studies that do not isolate smokers from nonsmokers); Uranium Mining and Lung Cancer in Navajo Men, id. at 75 (study controlled for nonsmokers); Respiratory Disease: Mortality Among Uranium Miners, id. at 80 (separation into cigarette-smoking groups clearly indicates cigarette smoking has played a part in both cancer and pulmonary insufficiency deaths).
One of the most notable witnesses during the Congressional hearings was Victor E. Archer, M.D., a physician who has spent his career studying the incidence of respiratory disease among uranium miners. At the time of the original hearings, Archer recommended that Congress set the same WLM thresholds for both lung cancers and nonmalignant respiratory diseases. Archer Aff. ¶ 3. Now, as evidenced by his current affidavit, Archer has changed his position. Although I am mindful of the inherent fluidity of scientific knowledge over time, scientists today probably know more about the etiology of disease than was known in the past. However, absent constitutional infirmity, the proper forum for changing congressional statutes or administrative regulations based on scientific knowledge is Congress or the administrative agency charged with execution of congressional intent and policy. Bright line classifications such as “smoker” or “nonsmoker” and numerical cutoffs are bound to be under-inclusive in certain situations. However, they are rationally related to the purposes and policy of the statute sufficient to withstand constitutional attack. See Knutzen v. Eben Ezer Lutheran Housing Center, 815 F.2d 1343, 1352 (10th Cir.1987).
Accordingly, it is ORDERED that:
1. the Department of Justice’s order of February 25, 1994 denying plaintiff Howell’s claim for compensation under RECA is AFFIRMED; and
2. the Department of Justice’s order of April 7,1995 denying plaintiff Ball’s claim for compensation under RECA is AFFIRMED.